[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 04-12485

———————————————

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 5, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00056-CR-4-RH-WCS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KATHY MILLS LEE,

Defendant-Appellant.

———————————————

No. 04-13673

———————————————

D. C. Docket No. 03-00056-CR-RH-WCS

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

JOSEPH MICHAEL WYMAN,

Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of Florida

———————————————————

**(October 5, 2005)**

Before CARNES and PRYOR, Circuit Judges, and FORRESTER[*], District Judge.

FORRESTER, District Judge:

Joseph Michael Wyman and Kathy Mills Lee challenge the judgments and sentences imposed for committing three counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1342. The grand jury returned a true bill against Wyman and Lee on February 24, 2004, and a joint trial commenced on March 1, 2004. The jury returned a general verdict of guilty on all three counts of the indictment on March 4, 2004.

Wyman and Lee contend the evidence was insufficient to convict them of mail fraud and contend that the district court improperly admitted hearsay and opinion testimony during trial. Wyman and Lee also raise sentencing objections, contending that they were sentenced in violation of *United States v. Booker*, 125

---

[*] Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

S. Ct. 738 (2005),[1] and that their sentences were based upon unreliable evidence and factors not proven by a preponderance of the evidence.  The appellants also object to the district court's admission of alleged opinion and hearsay evidence. Lee raises an individual objection to the district court's denial of her motion to continue sentencing until such time as she could be sentenced with Wyman.

## I.  Background

### A.  The Financial Scheme

Appellants' convictions arise out of their attempts to use a nonexistent banking channel not only to obtain goods without payment but also to retain use of those goods as long as possible.  Between 2000 and 2002, Appellant Wyman attended several seminars and conferences instructing attendees in "alternative" banking channels.  Through these seminars, Wyman was taught about implausible theories of private offset exchanges, a commercially unrecognized system rooted in the notion that the United States Treasury amasses moneys rightfully belonging to individuals.  Private offset exchanges were claimed mechanisms for individuals to access this Treasury-held money.  Using closed checking accounts, an individual would write a check to obtain a good or service.  As these checks were

---

[1] Appellants raised this issue as a claim under *Blakely v. Washington*, 542 U.S. 296 (2004).  Subsequent to briefing, the United States Supreme Court issued its opinion in *Booker*, which addressed the implications of *Blakely* to the United States Sentencing Guidelines. Accordingly, Appellant's *Blakely* challenge will be treated under *Booker*.

written on closed accounts, the account on which the check was drawn could not provide the funds to pay for the goods. Instead, these offset checks were theoretically to be presented to the Treasury by the drawee bank or payee for reimbursement with the stockpiled funds.

Between the summers of 2002 and 2003, Kathy Mills Lee and Joseph Michael Wyman uttered more than one million dollars' worth of personal checks drawn upon closed bank accounts. Lee wrote checks drawn upon her account at Citizens Financial Services in Indiana. On August 29, 2002, Lee wrote to Citizens to close her account for ongoing transactions but informed Citizens that she intended her account to remain open for adjustments and setoffs. After the letter was sent, Lee wrote sixteen checks totaling $192,982.10 on the closed Citizens account. Included among these checks were a $121,914.09 check to pay off her mortgage, a check to pay off a $12,000 home equity line of credit, and $5,769 in checks written to Wyman. Wyman deposited these checks into his account at the South Trust Bank in Tallahassee, Florida, on occasion utilizing a split deposit to walk away with cash.

Wyman also did his share of check-writing, utilizing former checking accounts in Georgia and California to write more than $800,000 in offset checks on closed accounts. Among Wyman's many checks were two drafted for $110,000

4

and $449,000 to purchase an option on a Destin beachfront property. Further, Wyman passed a $79,077.40 check for a BMW and wrote another two checks for two Acuras in the amounts of $33,972.61 and $45,325.21. Lee was also the beneficiary of Wyman's check-writing, receiving more than $8,500 in checks written on closed accounts. Lee and Wyman also attempted to pay off the mortgage on Lee's sister's home with an offset check for $9,676.59.

When the payees of these offset checks complained that the checks were being dishonored, Wyman and Lee employed a range of responses to the complaints. The first response to merchant complaints was typically to ignore the situation. In some cases this strategy proved effective, as several merchants and banks simply wrote off their losses. For example, ABC Liquors eventually wrote off Lee's $1,154.70 purchase as a bad debt after several phone calls and an attempt to negotiate the check as an offset check failed. Similarly, Sam's Club gave up on collecting payment for $584.77 in merchandise purchased by Lee with an offset check, and Bank of America and Capital City Bank wrote off the negative balances in Wyman's and Lee's accounts as losses. To more persistent payees, Wyman and Lee would send paperwork which they claimed would facilitate redemption of these offset checks. The papers informed merchants that while the closed checking accounts were not open for public transactions, they

5

were open for private offset or exchange transactions. Wyman and Lee urged the payees to negotiate these offset checks with banks or, alternatively, directly with the Treasury. Unsurprisingly, the record does not reveal any successful negotiations of these offset checks by merchants or banks.

While some of the check recipients and banks simply wrote off their debts, other payees pursued legal action. Vanderbilt Mortgage, mortgage lender for Lee's sister's home, threatened legal action to recover its losses after discovering the offset check meant to pay off the loan balance was written on a closed account. Although it served legal notice of the default on Lee's sister, Vanderbilt eventually charged off the unpaid balance as a loss. A BMW dealership, Quality Imports, repossessed a vehicle it sold to Wyman after discovering the offset check used to fund the purchase was a bad check. Fortunately, Quality Imports was able to repossess the car a few days after the original sale. Community First, the lender on a car owned by Wyman, also turned to repossession to recoup its losses. Community First was less fortunate than Quality Imports, however, as the sale of the repossessed car was insufficient by approximately $9,000 to cover the full amount of the loan. Similarly, Ford Motor Credit obtained a civil judgment against Lee for the debt remaining after Lee's attempt to pay for her Explorer failed. Lee had written checks to both Ford Motor Credit and then later to a local

6

dealership in an attempt to pay off and purchase her leased car, but these transactions fell through once the offset checks were dishonored.

First South, Lee's mortgage company, resorted to foreclosure after checks written by Lee to pay off her mortgage and home equity loans were dishonored. For approximately $1,000, Lee and Wyman purchased from Cindy Beers, an exchange transaction proponent, a package of documents meant to discharge a mortgage. (Wyman testified that he thought the package had worked in achieving the write-off of Lee's sister's mortgage.) Following Beers' mortgage-discharge package, which involved ten to twelve different steps of paperwork, Wyman and Lee first sent First South a request for payoff and then sent an offset check to redeem the debt. The bank failed to verify whether the payoff check was valid, and consequently First South erroneously sent a notice of satisfaction on both the mortgage and line of credit, even sending a refund for overpayment on the line of credit. Upon discovering its mistake, First South sent Lee notices of nonpayment. Wyman and Lee ignored these notices, instead sending in more paperwork from the Beers package. Eventually, First South filed a foreclosure motion. Wyman and Lee responded to the lender and its counsel with still more documents from the Beers package. Two of the documents in the indictment, a "Notice of Acceptance" and a "motion to dismiss," were part of this attempt to achieve

satisfaction of the mortgage and retention of the house. Due to these delaying tactics, it took First South almost a year from receipt of the bad check to recoup its losses.

Some recipients of offset checks, however, fared relatively better at the hands of Wyman and Lee. Bert Moore, the attorney handling the Destin property deal, as well as Affiliated Travel, a coin dealer, had refused to allow Wyman to take receipt of any goods until his checks cleared and so did not sustain any losses. Similarly, Proctor & Proctor, at which enterprise Wyman attempted to purchase two Acuras, never sustained actual losses as Proctor's bank refused to act as fiduciary and process the offset check Wyman offered in payment. Wyman also made good a $950.68 debt to Hair Options, a provider of hair replacement services; after discovering the offset check had been dishonored, Hair Options' threat to stop providing its services to Wyman mid-treatment proved effective. South Trust Bank also found threats of legal action to be effective, as Wyman reimbursed the negative balance in his account with that institution when the bank threatened to call law enforcement.

**B. Challenged Evidence at Trial**

In detailing the operation of Wyman and Lee's financial scheme, the trial court admitted several pieces of evidence that are now one basis for these appeals.

8

First, the district court allowed the government to introduce into evidence a letter written by Citizens' counsel to Lee, in which Lee was informed by the bank that she had to stop writing checks on a closed account. The letter told Lee that to continue to do so would be check fraud. Second, the district court allowed the government to introduce an e-mail written by a Capital City Bank employee referring to Wyman as a con artist. The letter and e-mail writers never testified at trial. The district court also allowed the attorney handling First South's foreclosure action to testify during his redirect examination by the government that he believed Wyman and Lee had committed illegal acts.

Finally, the parties dispute the importance of testimony provided by Bert Moore, the attorney handling the Destin property deal. Moore testified that he only remembered receiving one offset check from Wyman as consideration for the purchase of an option on the property. Moore further recalled that check as being for $111,000. Wyman, however, provided testimony which indicated that he wrote two checks on that property. Further, Wyman composed a letter to Capital City Bank in which he urged that bank to honor two checks, for $111,000 and $449,000, written to Bert Moore.

**C. Sentencing**

While Wyman and Lee were jointly tried, the appellants were sentenced at different times. During the time scheduled for a joint sentencing hearing, the district court granted a defense motion to continue Wyman's sentencing to permit a mental health examination. After ascertaining that the government and Lee's counsel were ready to proceed, Lee was sentenced on May 13, 2004. At her sentencing hearing, Lee did not raise any kind of *Blakely*-style objection to extra-verdict enhancements. Wyman was sentenced two months later, on July 13, 2004. During Wyman's sentencing hearing, conducted after the Supreme Court's opinion in *Blakely v. Washington* was handed down, Wyman raised a *Blakely* objection to extra-verdict sentence enhancements. Wyman also was sentenced on the basis of a reduced loss calculation, as the district court determined that two checks, both counted as part of the scheme, were actually written to accomplish the same purpose: to pay for Lee's Ford Explorer. Lee did not receive the benefit of this adjusted calculation of loss in her earlier sentencing hearing.

**II. Discussion**

**A. Sufficiency of the Evidence**

Wyman and Lee contend that the three mailings alleged in support of the mail fraud charges are insufficient to form the basis of a mail fraud conviction.

We review challenges to the sufficiency of the evidence *de novo*. *United States v. Hooshmand,* 931 F.2d 725, 733 (11th Cir. 1991). The evidence must be considered in the light most favorable to the government, and all inferences and credibility determinations must be drawn in favor of the jury's verdict. *United States v. Cooper*, 132 F.3d 1400, 1404 (11th Cir. 1998). If there is any reasonable construction of the evidence that would allow the jury to find the defendant-appellants guilty beyond a reasonable doubt, we must affirm the convictions. *Id*.

The mail fraud statute, 18 U.S.C. § 1341, prohibits the use of the mails in furtherance of a scheme to defraud. *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995). In order to prove a violation of § 1341, it is the government's burden to prove that the accused intentionally participated in a scheme to defraud and used the United States mails to carry out that scheme. *Id*. While a mailing is a required element of a § 1341 claim, the use of the mails need not be an essential element of the scheme; for a mail fraud conviction, it is sufficient if the government shows that the mailing was "incident to an essential part of the scheme" or "a step in the plot." *Id*. at 569 (internal citations omitted).

### 1. August 29, 2002 Letter

The first mail fraud count was based upon the August 29, 2002 letter sent by Lee to Citizens Financial Services, her former bank. The evidence elicited at trial

11

showed that Lee called Citizens in August 2002 to close her account but was informed that the checking account had already been closed for approximately one year. Lee then sent the August 29, 2002 letter to Citizens again asking the bank to close her account. The letter stated:

> Notice to Settle and Close Accounts. . . . This letter of NOTICE TO SETTLE and CLOSE ACCOUNTS is notice to you, in both your private and official capacities, as CFS Bancorp, Inc., that the above referenced account is Accepted for Value and Exempt from Levy.
>
> This account is considered closed for any ongoing debit or credit entries for the undersigned Principal in Fact.
>
> This account will remain open for any adjustments or setoffs, through the Principal in Fact's exemption.

The phrase "Accepted for value, Certified and sworn on the Undersigned's unlimited commercial liability" was stamped across the documentation, and the letter also referred to the Uniform Commercial Code § 3-419 and House Joint Resolution 192 of June 5, 1933. H.R. J. Res. 192, 73rd Cong. (1933) (providing for the suspension of the gold standard). Citizens' representative testified at trial that the letter caused her to seek advice from others within the bank and also caused great confusion as to the appellants' meaning and purpose in sending the letter. Citizens' counsel wrote to Lee, warning her that writing checks on closed checking accounts could be considered check fraud. In response to that letter, Lee informed Citizens that she intended to use the account for private asset exchanges,

12

not for public transactions. Further, the government elicited Wyman's testimony that the August 29 letter was sent to advance the offset financial scheme.

Given this evidence, we find that a reasonable jury could determine that the August 29, 2002 letter was a mailing in furtherance of the scheme to defraud. Wyman and Lee's scheme was two pronged, first writing checks on closed accounts to obtain goods and services without paying for them, and second working to retain those goods as long as possible by convincing merchants and banks that the offset checks were actually legitimate. Whether the appellants' explanations of the offset scheme simply bought them time with the wrongly obtained fruits of their scheme or convinced the banks and merchants to write off the debt, either way, their scheme depended on attaching at least some semblance of credibility to their scheme. The August 29, 2002 letter to Citizens could be reasonably viewed as a method of causing that bank either to attempt to negotiate the checks with the Treasury or, alternatively, to hesitate or delay before dishonoring Lee's checks to merchants. Thus, a reasonable jury could view the letter to Citizens purporting to close the checking account for public purposes but open it for private offsets a step in the plot incident to an essential element of the scheme. Accordingly, we must find that there is sufficient evidence to support the

jury's verdict as to the first count of the indictment relating to the August 29, 2002 letter.

## 2. Response to Foreclosure Complaint, Summary Judgment

Wyman and Lee also challenge their convictions on the two other counts of the indictment, both of which are based upon mailings sent by the appellants to opposing counsel in the foreclosure action on Lee's home.[2]  After discovering that Lee's check purporting to pay off her mortgage was written on a closed account, First South[3] initiated foreclosure proceedings.  Lee and Wyman responded to the foreclosure motion with documents from the Beers package.  Among the many documents Lee and Wyman submitted were the final two mailings charged in the indictment, an April 11, 2003 "Notice of Acceptance" and an April 22, 2003 motion to dismiss, both mailed to First South's counsel.

In the Notice of Acceptance, Lee wrote:

I have exchanged my exemption (EIN # 260027391) for the discharge of the charges.  I hereby request an appearance bond at no cost to me so I can enter a plea for the Defendant.  I do not intend to dispute the

[2] Appellants made a Rule 29 motion at the close of all the evidence which was denied by the district court.  Several theories were advanced as to why these two letters, mailed to First South's law firm, were essential to the scheme to defraud.  The district court gave a general charge to the jury on the mail fraud counts, and we now find that the evidence recited herein is sufficient to support the jury's verdict on those counts.

[3] The entity formerly known as First South is now Branch Bank & Trust.  As Wyman and Lee dealt with the bank when it was known as First South, we will continue to refer to that entity as First South throughout this opinion.

facts. Based upon the issuance of the appearance bond and the absence of an assessment and findings of fact and conclusions of law, I will plead guilty to the charges and exchange my exemption for full settlement of the account.

Lee attached copies of the summons, lis pendens, and complaint to her mailing and affixed the same "Accepted for assessed value & returned in exchange for closure and settlement of this accounting" stamp across each document.

In the motion to dismiss, Lee submitted an affidavit in opposition to foreclosure. Among her various testimonial statements, Lee affirmed: "I have not seen nor been presented with any material fact which demonstrates that the Creditor is in receipt of any document that verifies, under penalty of perjury, that the Defendants owe [First South] any balance of any amount on any alleged debt, and believe that none exists." As part of the April 22, 2005 motion to dismiss, Lee also submitted to First South's counsel a Notice of Default and Entry for Notarial Protest. This document asserted that First South was in default on its contract with Lee and through this default had waived its rights. Wyman testified that the purpose of all of these documents, part of the Beers package, was to cause the lender to discharge the mortgage on Lee's home.

A reasonable jury in possession of this evidence could find that the Notice of Acceptance and motion to dismiss were mailed in furtherance of the scheme to defraud. Wyman testified that the purpose of the entire Beers package of

documents was to get the mortgage discharged. These two mailings, part of that larger stack of documents, further that purpose. The Notice of Acceptance purports fully to settle the mortgage by exchanging Lee's "exemption" for a settlement of the debt. The motion to dismiss denies that any debt actually exists. Moreover, the Notice of Default, sent with that motion to dismiss, attempts to place First South in default to Lee and even informs that bank that it has somehow waived its rights to collect under any original terms. These letters to First South's counsel, part of the larger Beers blizzard of documents, are all designed to obfuscate Lee's actual obligation on the mortgage loan. Drawing upon these facts, a reasonable jury could view these letters, and the entire Beers package of documents, as steps in the scheme to keep Lee's home without payment. We must therefore find that there is sufficient evidence in the record to support the jury's verdict on the second and third counts of the indictment.

Wyman and Lee, however, contend that as these two mailings were sent as part of litigation, strong policy considerations prevent us from basing a mail fraud conviction upon the foreclosure documents. In support of their argument, the appellants cite *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002), in which we considered the legal sufficiency of a mail fraud indictment based upon false affidavits attached to a motion for preliminary injunction. Defendants

16

Pendergraft and Spielvogel proposed to open an Ocala, Florida abortion clinic but faced local opposition to their plans. *Id*. at 1200. After receiving a phone call from Spielvogel seeking money in return for abandoning the clinic, the chairman of the County Board of Commissioners, Cretul, contacted the Federal Bureau of Investigation ("FBI"), which began taping conversations between Cretul and the defendants. *Id*. at 1200-01. At some point after the FBI began its monitoring, Spielvogel contacted the FBI and alleged that Cretul had threatened him. *Id*. at 1201. Due to its monitoring, however, the FBI knew this claim to be false. *Id*. Subsequently, Pendergraft offered to abandon his clinic and stay away from the city at a rate of $550,000 for three years, $750,000 for five years, or $1,000,000 for a permanent absence. *Id*. After Cretul declined the offer, the defendants opened the clinic. *Id*. Pendergraft and the clinic then filed suit seeking injunctive relief to obtain protection against protesters. *Id*. In support of their suit, Spielvogel and Pendergraft submitted affidavits contending that Cretul threatened them in violation of the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248. *Id*. These affidavits were filed with the court and also served by mail upon opposing counsel. *Id*. at 1208.

In considering the legal sufficiency of the mail fraud counts in the indictment, we acknowledged that serving a motion by mail was a common

17

litigation practice, and that prosecuting litigation activities would tend to inhibit policies promoting access to the courts. *Id*. We also recognized that the mail fraud statute cannot encompass all criminal schemes, *id*. at 1209, and that a malicious prosecution claim might be a more appropriate vehicle to deal with mailings made in the course of litigation. *Id*. at 1208. These statements, however, were simply dicta. In our analysis of the legal sufficiency of the claim, this court focused on whether or not Spielvogel and Pendergraft had the necessary intent to deceive. *Id*. at 1209. The *Pendergraft* defendants were aware that Cretul would know there were never any threats, and so they could not have intended to deceive Cretul with their false allegation. *Id*. Ultimately, it was due to the absence of an intent to deceive, and not upon any policy concerns relating to using the mails in connection with litigation, that we held that the mail fraud indictment failed to charge an offense as a matter of law. *Id*.

Wyman and Lee's attempt to draw parallels between the facts of this case and *Pendergraft* are unpersuasive. Most important, the two mailings at issue were not mailings to the court, but rather mailings to First South and its counsel. Wyman and Lee did not instigate suit at all; indeed, considering that their fraudulent scheme involved obtaining goods with offset checks and then holding on to possession as long as possible, a foreclosure action would be a hindrance to

18

their plans. Wyman's testimony indicates that the Beers package of documents was intended to influence the lender and its counsel and not at all directed toward influencing the courts. Although these documents eventually did make their way into the foreclosure record and before the trial judge, First South's attorney testified that he filed those documents, not Wyman or Lee. We have discovered no evidence that shows Wyman or Lee actively sought to involve the courts in the foreclosure dispute;[4] on the contrary, Wyman's testimony indicates that use of the Beers package of documents was designed to avoid foreclosure altogether. Second, there was no intent to deceive in the *Pendergraft* legal mailings. Wyman and Lee's Notice of Acceptance and motion to dismiss, by contrast, were part of a package of documents that was designed expressly to attempt to mislead the lender so as to obtain the discharge of the debt and the release of the mortgage after the bank discovered that the check was worthless. In one final point of distinction, the *Pendergraft* defendants were charged for a fraud which directly involved mailings to the court. Lee and Wyman were indicted and eventually convicted for knowingly writing checks on closed accounts and then using the mails to confuse and avoid their creditors. Given that Lee and Wyman's mailings were not directed

---

[4] To be sure, the defendants did appear at a hearing on the lenders motion for summary judgement. At that time Wyman caused the court to deny the motion by producing the documents erroneously sent by the bank stating that the indebtedness were satisfied after it received the initial bad check.

by them toward the court, the fact that the appellants were indicted on the basis of these mailings does not raise the same concerns of access and finality raised in the *Pendergraft* opinion.

We recognize, of course, that there are real public policy concerns inherent in allowing litigation materials to form the basis of a mail fraud claim, but those policy concerns have never been thought to preclude perjury prosecutions. Even if we read *Pendergraft* as appellants would like, we do not believe the mailings in this case implicate those policy concerns for the reasons already discussed. While we must be mindful of the concerns for placing obstacles in the path of full access to our courts, we cannot countenance mailing false claims clothed in legalese to lenders, with the intent of perpetrating or perpetuating a fraud, even where litigation is ongoing. For all these reasons, we find there is sufficient evidence to affirm the jury's verdict on all three counts of the indictment.

### B. *Booker* issue

Citing *Blakely v. Washington*, 542 U.S. 296 (2004), which we now interpret as a claim under *United States v. Booker*, __ U.S. __, 125 S. Ct. 738 (2005), both Wyman and Lee contend that their sentences were improperly based upon facts not admitted nor found by jury verdict. The superseding indictment did not allege an amount of loss nor number of victims, and the jury never made a finding as to loss,

20

number of victims, nor obstruction of justice. As Lee's and Wyman's sentences were based in part on these factors, the appellants contend that their sentences violate *Booker*.

There are two types of *Booker* error which a district court may commit in sentencing: constitutional and statutory. A constitutional *Booker* error occurs when extra-verdict enhancements are used to reach a result under the United States Sentencing Guidelines ("the Guidelines") that is binding on the sentencing judge. *United States v. Shelton*, 400 F.3d 1325, 1331 (11th Cir. 2005). A statutory *Booker* error, in contrast, consists in sentencing a defendant under the Guidelines as if they were mandatory and not advisory, even in the absence of a Sixth Amendment violation. *Id*. at 1330-31. As Wyman and Lee challenge the use of extra-verdict facts in the construction of their sentences, they are alleging a constitutional *Booker* error. Wyman raised a *Blakely* objection to the district court, now construed as an objection under *Booker*, so we review for harmless error. *United States v. Davis*, 407 F.3d 1269, 1270 (11th Cir. 2005). We explained in *United States v. Paz*, 405 F.3d 946, 948-49 (11th Cir. 2005), that *Booker* constitutional errors are harmless where the government can show beyond

reasonable doubt that the error did not contribute to the defendant's ultimate sentence.[5]

In *Paz*, the defendant pled guilty to violation of 18 U.S.C. § 1029(a)(1) for using a skimming device to make counterfeit credit cards. *Id*. at 947. Paz's sentence was enhanced six levels based upon a judicial finding, not admitted to by the defendant, that the amount of loss was between $30,000 and $70,000. *Id*. Paz objected to the loss enhancement at the sentencing hearing, but the district court overruled his objection in reliance on *United States v. Reese*, 382 F.3d 1308 (11th Cir. 2004), *vacated by __ U.S. __*, 125 S. Ct. 1089 (2005), *aff'd in part and vacated and remanded in part*, 397 F.3d 1337 (11th Cir. 2005). *Id*. at 948. Building upon this enhancement for amount of loss, the district court sentenced Paz to ten months' imprisonment. *Id*. The district court judge stated, however, that in the event that the Guidelines were held to be unconstitutional, in whole or in part, he would have sentenced Paz to six months' imprisonment. *Id*. Utilizing harmless error review, this court determined that the government could not meet its burden to show the constitutional error was harmless beyond a reasonable

---

[5] Harmless error review of a *Booker* statutory error, by contrast, is subject to a less demanding test: whether a court could determine that the error did not affect the sentence, or had only a slight effect. *See United States v. Robles*, 408 F.3d 1324 (11th Cir.2005); *United States v. Hornaday*, 392 F.3d 1306, 1315-16 (11th Cir. 2004). For this reason, if we interpret Wyman's *Blakely* objection as including a *Booker* statutory error claim, our holding that the constitutional error is harmless would, *a fortiori*, dictate the same holding as to the statutory error.

doubt because of the district court's statement that, if not bound by the Guidelines, it would have imposed a shorter sentence. *Id*. at 948-49.

In marked contrast to *Paz*, the district court explicitly stated that it would have given Wyman the same sentence whether the Guidelines were mandatory or advisory. Moreover, the district court expressly considered the 18 U.S.C. § 3553(a) sentencing factors when composing its alternative, non-Guidelines sentence. Accordingly, we find that the government has carried its burden of showing that the *Booker* constitutional error was harmless beyond a reasonable doubt, as it is clear that the extrajudicial enhancements did not contribute to Wyman's sentence.[6] *Cf. United States v. Robles*, 408 F.3d 1324 (11th Cir. 2005) (finding no *Booker* error where the sentencing judge stated that he would impose the same sentence whether the Guidelines were mandatory or advisory).

---

[6] While Lee did not make a *Blakely/Booker* objection to the district court, she now attempts to adopt Wyman's objection as her own. *See infra*, Section D. We need not consider whether or not Lee's attempt to co-opt Wyman's properly-raised *Booker* objection may be given effect, as the government and Lee have agreed that remand for resentencing is appropriate. Accordingly, we find that any possible *Booker* objection Lee might raise to her sentence is moot.

23

## C. Sentencing Factors

In addition to the *Booker* challenge, we are also confronted with a challenge to the district court's use of the Guidelines in calculating Wyman's and Lee's sentences. In particular, the appellants object to the district court's calculation of loss. Additionally, the appellants also objected to the district court's calculation of the number of victims and its refusal to reduce sentence under the Guidelines for attempt. This court reviews a district court's factual findings for clear error and its application of the Guidelines *de novo*. *United States v. Auguste*, 392 F.3d 1266, 1267 (11th Cir. 2004); *see also United States v. Crawford*, 407 F.3d 1174 (11th Cir. 2005) (holding that the *Booker* decision did not change the standard of review for application of the Guidelines).

### 1. Proof of Loss

An amount of loss determination is reviewed by this court for clear error. *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999). A sentencing court need only make a reasonable estimate of the loss, given the available information. *United States v. Wilson*, 993 F.2d 214, 218 (11th Cir. 1993). A sentencing judge, however, may not speculate about the existence of a fact that would permit a more severe sentence. *Id*.

Defendants argue that there is insufficient proof of the $449,000 check written by Wyman to Bert Moore in order to purchase an option on the Destin property. In his testimony at trial, Moore testified that he first received a $111,000 check from Wyman and Moore during their face-to-face negotiations for the property and discussed the difficulties he had when he attempted to present the offset check to the bank for payment. When asked whether the $111,000 check was the only check he received from the appellants, Moore responded that it was the only one he recalled. Based upon Moore's testimony, Wyman and Lee contend there is insufficient evidence that the second check for the Destin property, a check for $449,000, was ever part of the fraudulent scheme.

Moore's testimony, however, was not the only evidence in the record regarding the existence of the second option check. During his testimony, Wyman stated that he gave Moore not only the $111,000 check, but also testified that there was a second check he gave Moore. Moreover, a letter written by Wyman to Capital City Bank referenced the $449,000 check. Wyman's letter chastised the bank for not processing previous offset checks and further stated, "Please notify agents of your banking department that are processing these checks and instruct

25

them to process future checks, such as checks 1005 and 1006 to Bert Moore, for exemption exchanges equal to $111,000 and $449,000 respectively."[7]

Reviewing the evidence before the district court, we must conclude that the court did not err when it included the $449,000 check in the loss calculation. While there was no paper copy of the check produced, Wyman's testimony intimated that he actually gave two checks to Moore, thus contradicting Moore's testimony that he only recalled receiving one check. Moreover, Wyman wrote a letter to Capital City Bank seeking to ensure that a $449,000 offset check to Moore would be honored even though written on a closed account. Taking all of this evidence together, there is more than speculation to tie a $449,000 check to the appellants' fraudulent scheme. Moreover, as the Guideline sentence enhancement properly applied to these facts is for losses between $400,000 and $1,000,000, there is no need to consider any other arguments raised by Wyman and Lee as to the calculation of loss.[8] United States Sentencing Commission, *Guidelines Manual*, §2B1.1(b)(1)(H) (Nov. 2002).

---

[7] During oral argument, we asked counsel about this second, $449,000 check and were told that no extant copy of the check was ever found.

[8] Wyman and Lee seek offsets to the calculation of loss for reclaimed goods or where a security interest protected a victim from loss. The Guidelines will only offset loss for returned goods if those goods are returned before the scheme is detected. USSG § 2B1.1, comment. (n.2(E)(i)). Reduction of loss is contemplated for amounts recovered from collateral. *Id*. at n.2(E)(ii). We need not decide this question, however, as the $449,000 check alone supports a fourteen-level Guideline enhancement under USSG § 2B1.1(b)(1)(H).

## 2. Attempt

Wyman and Lee also contend that their sentences should have been reduced under Guideline § 2X1.1(b)(1), which directs a sentencing court to apply a three-level reduction to a sentence "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense." USSG § 2X1.1(b)(1). This three-level reduction may be declined, however, if the factual circumstances show that the offense was about to be complete but for an interruption beyond the defendant's control. *Id.* The facts of this case clearly demonstrate that Wyman and Lee completed all the acts necessary to commit mail fraud. There is no dispute that they actually mailed the August 29, 2002 letter to Citizens, as well as the two letters from the Beers package to First South's counsel. Moreover, Wyman and Lee completed the acts underlying their scheme to defraud – they wrote checks on closed accounts, provided misleading information to banks and payees in an attempt to have the bad checks honored, and thus were able to either keep outright or to retain for a lengthy period of time their ill-gotten gains. The fact that their offset checks were not in fact honored cannot be credited to Wyman and Lee but rather to the good sense of the banks and merchants ensnared in this financial scheme. Accordingly, we affirm the district court's refusal to apply a reduction in sentence for attempt.

### 3. Number of Victims

The appellants also object to the district court's calculation of the number of victims. Wyman and Lee point out that in many cases their victims were able to offset their losses through such means as collateral and repossession, and thus that these secured individuals should not be considered victims. Guideline section 2B1.1(b)(2)(A)(i) provides that the basic offense level should be increased two levels if the offense involved ten or more victims. The Guidelines Application Notes define a victim as "any person who sustained any part of the actual loss determined under subsection (b)(1)." USSG § 2B1.1, comment. (n.3(A)(ii)). The Guidelines further define actual loss as reasonably foreseeable pecuniary harm resulting from the offense. *Id*. at n.2(A)(i). Pecuniary harm is defined as monetary or other harm that can be monetized but excludes emotional distress, harm to reputation, or non-economic harms. *Id*. at n.2(A)(iii). For a pecuniary harm to be reasonably foreseeable, the defendant must have known or, in the circumstances, reasonably should have known that the harm was a potential result of the offense. *Id*. at n.2(A)(iv).

None of the definitions provided by the Guidelines speak to the specific challenge posed by Wyman and Lee: whether a victim who is reimbursed for his loss qualifies as a victim for the purposes of § 2B1.1(b)(2)(A). We have only

discovered one other circuit opinion which discusses this issue, *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005). In *Yagar*, the defendant pled guilty to theft of stolen mail in violation of 18 U.S.C. § 1708. *Id*. at 968. Yagar used stolen checks to make deposits in excess of $88,000 into the accounts of more than fifty individuals and then withdrew portions of those deposited funds, ultimately receiving $20,987.15 in cash. *Id*. Yagar's sentence was enhanced two levels under Guideline § 2B1.1(b)(2)(A) for a crime involving more than ten but less than fifty victims. *Id*. On appeal, all parties conceded that five banks sustained actual losses within the meaning of the Guidelines, but Yagar contended that the further six victims, individual account holders, could not be counted for the purposes of § 2B1.1(b)(2)(A) because they were reimbursed by their banks for their loss: the cost of buying new checks for new checking accounts. *Id*. at 970. The *Yagar* court concluded that the account holders were not victims because they were fully reimbursed for their temporary loss. *Id*. at 971. Nevertheless, the Sixth Circuit opinion acknowledged that there were circumstances where a reimbursed individual could still be considered a victim but distinguished that eventuality from the facts before them, in which the monetary loss was short-lived and immediately covered by a third party. *Id*.

*Yagar*, of course, is not binding upon this court and only has effect upon us to the extent of its persuasiveness. Our reading of *Yagar* indicates that the case did not read the actual loss provisions together with the Application Notes discussing credits against loss. § 2B1.1, comment. (n. 2(E)). *See generally United States v. Inclema*, 363 F.3d 1177 (11th Cir. 2004) (directing courts to read the text of the Guidelines and its accompanying commentary together). When considering the impact of recovered collateral, or the return of money, property, or services, to the victim, the Guidelines treat those so recovering as having suffered a loss but then allow the defendant to take credit against the total loss for the value of the recovered or returned loss. *Id*. Stated another way, inherent in the credit against loss provision is an acknowledgment that there was in fact an initial loss, even though it was subsequently remedied by recovery of collateral or return of goods. A concrete example exposes the flaw in the appellants' reasoning. The evidence at trial showed that Community First, holder of a loan secured by Wyman's car, repossessed that car as collateral. Even after selling the collateral, however, Community First was saddled with debt of approximately $9,000. Under the appellants' theory, however, Community First could not be considered a victim because it had collateral, even though that collateral proved insufficient. This does not comport with the Guidelines.

Even if we were to follow the reasoning of *Yagar*, moreover, the facts before us are significantly different than those before our sister circuit. Wyman and Lee contend that Ford Motor Credit, First South, Vanderbilt, Quality Imports, and Community First are not victims because they recovered security to offset their losses. Unlike the *Yagar* account holders, however, the monetary losses suffered by these parties were neither short-lived nor immediately covered by third parties. First South, for example, had to pursue foreclosure litigation for almost one year before being able to reach its security interest in Lee's home. Similarly, Ford Motor Credit had to file suit and secure judgment in order to reclaim its collateral, as Lee kept her car for approximately one year and only returned the vehicle after her arrest. Community First, as the entity receiving the car payments in the form of offset checks, also had to await judgment to reclaim its collateral. Quality Imports, which sold Wyman the BMW, had to repossess its car in order to recover its loss. Vanderbilt also had to wait an appreciable time and fruitlessly resort to a legal remedy in an attempt to reclaim its collateral, Lee's sister's home. In none of these cases was there a third party available to provide prompt indemnification. Moreover, unlike the individual account holders in *Yagar*, our victims suffered considerably more than a small out-of-pocket loss and were not

immediately reimbursed by any third party. For all these reasons, we affirm the district court's imposition of a two-level increase for number of victims.

### D. Denial of Continuance

Lee has a contention of error, specific to her own case, regarding the denial of her motion for a continuance of her sentencing hearing. Lee and Wyman were tried jointly and originally scheduled to be sentenced jointly, but Wyman's sentencing was postponed to allow his psychiatric evaluation. In the interim between Lee's sentencing and Wyman's sentencing, *Blakely* was decided. Unaware of the sea change *Blakely* would bring, Lee did not object to the use of judicial fact-finding in fashioning her sentence. In addition, Lee was sentenced on the basis of losses totaling more than $1,000,000, which carries a sixteen-level enhancement, while Wyman was later sentenced for the fourteen-level enhancement for losses between $400,000 and $1,000,000. This discrepancy stems from a calculation of loss that "double-counted" two checks intended to create a single loss. Thus, Lee contends that the denial of a continuance of her sentencing hearing to allow joint sentencing was error, depriving her of the benefit of *Blakely* as well as by the change in the calculation of loss.

The denial of a motion to continue sentencing is reviewed for abuse of discretion. *See United States v. Costello*, 760 F.2d 1123, 1126 (11th Cir. 1985)

32

(denying motion to continue trial). Lee's counsel informed the district court that her client was prepared to go forward on the appointed sentencing date. Accordingly, we cannot see how the district court abused its discretion in taking counsel at her word and sentencing Lee. *Cf. United States v. Verderame*, 51 F.3d 249 (11th Cir. 1995) (finding prejudice where denial of continuance prohibited defendant from preparing a defense). Moreover, whatever prejudice Lee suffered has been mooted, as the government does not challenge Lee's contention regarding the double-counting of loss. As Lee's case must be remanded to the district court for resentencing, her *Blakely* claim regarding a first appeal is also irrelevant. Accordingly, we find the district court did not abuse its discretion in denying Lee's motion to continue her sentencing to a date on which Wyman could be jointly sentenced.

**E. Admission of Hearsay and Opinion Evidence**

The appellants' fifth and final contention of error on appeal regards the district court's admission of three pieces of evidence: an e-mail describing Wyman as a con man, a letter advising Lee that her actions constituted check fraud, and testimony describing Wyman's and Lee's actions as clearly illegal. A district court's admission of evidence is examined for abuse of discretion. *United States v. De La Mata*, 266 F.3d 1275, 1300 (11th Cir. 2001); *see generally United*

33

*States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (finding that evidentiary rulings are reviewed deferentially for abuse of discretion). Lee and Wyman first object to a letter written by a Citizens employee to Lee stating, "Please be advised that issuing apparently negotiable instruments drawn against a bank account that you know may well be closed is check fraud." The second hearsay objection relates to an e-mail composed by a Capital City Bank employee stating, "Wyman is a con artist." The appellants contend that these are out-of-court statements that invaded the province of the jury on a pivotal issue and tainted the jury.

Our examination of the transcript, however, reveals that the district court judge admitted these statements not for their truth, but for the non-hearsay purpose of showing notice that the financial transactions were not recognized and were unlawful. In their opening statements, appellants' counsel suggested that the various banks involved in this case either did not believe these checks were illegal or did not clearly inform Wyman or Lee that their check-writing scheme was wrongful. Instead, defense counsel suggested that the problem was simply that these banks were too small and unsophisticated to negotiate offset checks. We do not believe it was an abuse of discretion to admit these statements for the non-hearsay purpose of showing the banks were aware that these transactions were wrongful and actually informed the appellants of this fact.

34

Wyman and Lee also object to the district court allowing First South's counsel to testify that appellants' actions in fighting the foreclosure suit were illegal. Putting the challenged statement in context, Mr. Robbins, an attorney handling the foreclosure action, was asked on direct examination to discuss the content of Lee's legal filings. On cross examination, Robbins was asked whether Lee was entitled to fight against a lawsuit by filing the sort of documents at issue, such as opposition to a motion to dismiss. Robbins conceded that there was nothing inappropriate in making such a filing. Upon redirect examination, the government then asked Robbins if it was appropriate to write a check on a closed account to pay off a mortgage. Robbins then testified that Lee was not entitled wrongly to state in a court filing that she had paid off the mortgage, nor was she entitled to write bad checks. As the district court pointed out in overruling the defense objections, the redirect questions as to the legality of Lee's actions opened the door to the government's follow-up question to Robbins. We find that the district court did not abuse its discretion in allowing this testimony to go before the jury. On this basis, we affirm the admission of evidence.

## III. Conclusion

We find there was sufficient evidence to sustain the convictions and also find that the district court did not err in its admission of evidence, in denying a sentencing continuance, or in calculating Wyman's sentence. In these respects, therefore, we AFFIRM the district court. As the parties are agreed that Lee's sentence was erroneously calculated, we REMAND the case to the district court for resentencing consistent with this opinion.