[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14751
Non-Argument Calendar

_____

D.C. Docket No. 4:12-cr-00003-RH-CAS-6


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIE JAMES COACHMAN,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(June 4, 2013)

Before TJOFLAT, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Willie James Coachman appeals his convictions and total 70-month sentence

for conspiracy to defraud the government with false tax returns, wire fraud, and

aiding and abetting wire fraud.  On appeal, Coachman argues that: (1) the trial testimony of Regan Glover ("Regan") constituted a substantial variance from the indictment; and (2) the district court clearly erred by calculating the total loss amount based, in part, on uncharged acts.  For the reasons set forth below, we affirm Coachman's convictions and sentences.

I.

In 2012, Coachman was indicted, along with several others, for conspiracy to defraud the United States by obtaining false tax refunds from the Internal Revenue Service ("IRS") in violation of 18 U.S.C. §§ 286 and 287.  The indictment also charged Coachman with seven counts of wire fraud and aiding and abetting wire fraud in violation of 18 U.S.C. §§ 1343 and 2.  Specifically, as to the conspiracy count, the indictment charged that Loretta Glover ("Loretta"), Henry Clayton ("Henry"), Tasheika Jackson, Melissa Clayton ("Melissa"), Tabitha Bass, Gregory Clayton ("Gregory"), Genetris Jones, Latosha Glover ("Latosha"), and Coachman conspired "together and with other persons" to defraud the United States by filing false tax returns.  Among other things, the indictment alleged that, as part of the conspiracy, Loretta created and filed false income tax returns by using the names and social security numbers of other individuals.  She also instructed and assisted other co-conspirators in obtaining unauthorized

2

biographical information that was used to file the returns.  Subsequently, she deposited some of the tax refund proceeds into Coachman's bank account.

Coachman proceeded to trial, at which the government presented several witnesses.  First, Donald Williams, an IRS agent, testified that he interviewed Coachman in September 2009 after several tax refunds were deposited into his bank accounts.  During the interview, Coachman indicated that Loretta had prepared his 2008 tax returns, he had known her "for a long time," and she was "like a daughter to him."  Further, Coachman allowed Loretta to use his bank accounts to deposit tax refund checks.  After the refunds were deposited, Coachman withdrew the money for Loretta, and she paid him $20 to $25 for each transaction.  Additionally, Coachman also gave Regan, one of Loretta's family members, access to his bank accounts, and he had a similar arrangement with her.

Loretta, who had pled guilty to the charges against her in this case, testified regarding her conduct.  Specifically, Loretta testified that she completed the paperwork and filed the fraudulent tax returns, and she directed the tax refunds to be deposited into Coachman's various bank accounts.  Loretta paid different "providers" for the information necessary to file the false tax returns and, during this time, she maintained notebooks in which she recorded the status of each return and whether it had been accepted by the IRS.  Additionally, Coachman gave his daughter, Danielle Coachman ("Danielle"), a book of names and identifying

3

information of "old people from his car lot," and Loretta and Danielle used the names to file tax returns. Coachman, Danielle, and Loretta split the profits from the returns equally. Throughout their relationship, Coachman loaned money to Loretta, and he understood that she paid him in fraudulent proceeds. Further, they discussed the schemes that Loretta used to file false tax refunds. Loretta paid Coachman $200 for each refund that was deposited into his accounts.

Next, Latosha, who had also pled guilty to the charges against her, testified that, along with other individuals, she used ancestry.com to obtain information that was used to file fraudulent tax refunds. In January 2011, several individuals met at Loretta's house to file taxes together and, during the gathering, Loretta and Danielle discussed which tax schemes worked better than others.

Regan testified that she pled guilty in the Middle District of Florida to filing false tax returns. After Regan filed false returns, she deposited the refunds into Coachman's bank account, and he charged her a fee for each deposit. During this time, Regan had conversations with Danielle regarding which tax fraud schemes worked better than others. On one occasion, Regan, Danielle, Latosha, and Loretta met to compare notes regarding which tax returns were successful and which ones were unsuccessful. Regan was told that they were all using Coachman's accounts to obtain tax refunds. Although Loretta and Regan "never did anything[] together," Regan knew that Loretta was also filing tax returns.

4

Brittany Upshaw, one of the victims of the tax fraud scheme, testified that, after Loretta had filed her taxes, she learned that her refund was deposited into Coachman's bank account. Finally, Patrick Brandon, a criminal investigator with the IRS, testified that he reviewed Loretta's notebooks, which contained notations reflecting the amounts that were deposited into Coachman's accounts. To confirm these amounts, Agent Brandon subpoenaed bank records, and he discovered that over 300 false tax returns were filed in connection with the conspiracy. However, the charges in the indictment were based solely on the tax returns listed in the notebooks that were found in Loretta's and Latosha's possession. In sum, the scope of Agent Brandon's investigation revealed approximately $2.4 million in attempted false tax refunds and approximately $750,000 in refunds that the IRS actually paid. These figures included Loretta's and Latosha's conduct, but not Regan's conduct. At the conclusion of the trial, the jury found Coachman guilty as to all counts.

The presentence investigation report ("PSI") noted that, as of the filing of the indictment, the individuals who were involved in the fraudulent tax scheme were known to have filed at least 356 tax returns, claiming refunds totaling $2,427,108 and resulting in the receipt of $761,554 from the U.S. Treasury. As to the fraudulent refunds that were deposited into Coachman's account between 2006 and 2009, several of the names associated with the refunds could not be directly

5

linked to Loretta.  In sum, between 2006 and 2009, the IRS discovered a total of $464,554.35, resulting from approximately 100 fraudulent tax refunds that were deposited into Coachman's accounts.  This total amount included $119,875.05, resulting from 27 deposits that were associated with tax returns that were filed by Loretta.  Accordingly, Coachman's involvement in the conspiracy resulted in a known intended and actual loss of $464,544.35.

The PSI grouped Coachman's offenses together pursuant to U.S.S.G. § 3D1.2(d).  Specifically, the PSI assigned Coachman a base offense level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1).  Further, the PSI applied a 14-level increase under U.S.S.G. § 2B1.1(b)(1)(H) because the total loss of $464,544.35 was more than $400,000, but less than $1,000,000.  Based on a total offense level of 21 and a criminal history category of V, the advisory guideline range was 70 to 87 months.

Prior to sentencing, Coachman objected to the PSI's calculation of the loss amount.  He stated that he permitted only Loretta to deposit money into his bank accounts, and he conceded that he allowed her to deposit a total of $119,875.05.  Further, he asserted that he "did not embrace or have knowledge of Loretta['s] larger involvement with others."

At sentencing, Coachman reiterated his challenge to the loss amount, noting that Regan had testified that she deposited additional money into Coachman's accounts that "had nothing to do with Loretta."  He further asserted that, as far as

6

he knew, Regan did not have any involvement with Loretta or the conspiracy charged in his indictment. Coachman stated that, "at a minimum," Regan's testimony constituted a "variant between the allegations in the indictment and the proof" at trial. Nonetheless, the loss amounts associated with Regan increased the total loss amount attributed to Coachman, even though those amounts were outside the scope of the charged conspiracy as well as the conspiracy that Coachman engaged in with Loretta.

Ultimately, the court found that the PSI correctly calculated the loss amount as part of the Coachman's relevant conduct under U.S.S.G. § 1B1.3. Specifically, the court explained,

> And so, if you look at it as the offense of conviction being the conspiracy with Loretta Glover, it's still true that the transactions with Regan Glover are part of the same course of conduct or at least part of the same common scheme or plan; and, therefore, they get counted. And that makes sense under the [G]uidelines approach. It's an approach that doesn't focus just on the offense of conviction, which would be easily manipulated by a prosecutor's charging decisions, but instead the [G]uidelines are intended to deal with real conduct. And so whether somebody gets charged with the Loretta Glover offense and the Regan Glover offense, or just gets charged with the Loretta Glover offense, it's still—the real conduct still involves the combined amount of loss from both, and that's properly considered the amount of the loss.

Based on this ruling, the court adopted the PSI's guideline calculations, which resulted in a total offense level of 21 and an advisory guideline range of 70 to 87 months. The court imposed concurrent 70-month sentences as to all counts.

7

II.

Ordinarily, we review a claim of constitutional error *de novo*. *United States v. Williams*, 527 F.3d 1235, 1239 (11th Cir. 2008). However, if an error is not preserved, we review only for plain error. *See United States v. Dortch*, 696 F.3d 1104, 1110-12 (11th Cir. 2012) (reviewing a constructive amendment argument for plain error, where the defendant did not object to the challenged jury instruction). Under plain error review, an appellant must show (1) an error that (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 731-32, 113 S. Ct. 1770, 1776, 123 L. Ed. 2d 508 (1993).

A "fundamental principle" derived from the Fifth Amendment is that "a defendant can only be convicted for a crime charged in the indictment" because "[i]t would be fundamentally unfair to convict a defendant on charges of which he had no notice." *United States v. Keller*, 916 F.2d 628, 632-33 (11th Cir. 1990). "Two types of problems can arise as a result of a trial court's deviation from an indictment," namely, (1) a constructive amendment or (2) a variance. *Id.* The concepts of constructive amendment and variance are "oft-confused." *United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir. 2004). A constructive amendment

8

occurs "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *Id.* In contrast, "[a] variance occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same." *Id.* A variance requires reversal only when a defendant establishes that his rights were substantially prejudiced. *Id.*

Thus, we will not reverse a conviction "because a single conspiracy is charged in the indictment while multiple conspiracies may have been revealed at trial unless the variance is (1) material and (2) substantially prejudiced the defendant." *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007). "The arguable existence of multiple conspiracies does *not* constitute a *material* variance from the indictment if, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found that a single conspiracy existed beyond a reasonable doubt." *Id.* (emphasis in original). If we conclude that there is a material variance, then we determine whether the existence of more than one conspiracy resulted in any substantial prejudice to the defendant. *Id.* To determine whether the jury could have found a single conspiracy, we consider: (1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *Id.* Separate transactions, however, are not necessarily separate conspiracies, "so long as the conspirators act in *concert* to

9

further a common goal." *Id.* (emphasis in original). The common goal element is interpreted "as broadly as possible," and we have repeatedly stated that, in this context, "common" means "similar" or "substantially the same," rather than "shared" or "coordinate." *United States v. Richardson*, 532 F.3d 1279, 1285 (11th Cir. 2008).

As an initial matter, although Coachman references the phrase "constructive amendment" in his brief on appeal, the substance of his argument appears to be that the evidence at trial constituted a substantial variance from the indictment. Specifically, he asserts that Regan's testimony at trial deviated from the facts that were alleged in the indictment because she was not a member of the charged conspiracy. Moreover, he concedes that the facts proven at trial contained the "same essential elements" as the facts alleged in the indictment. Thus, his argument on appeal appears to be that Regan's testimony constituted a substantial variance from the indictment, not a constructive amendment. *See Narog*, 372 F.3d at 1247.

Ordinarily, Coachman's constitutional claim would be reviewed *de novo*. *See Williams*, 527 F.3d at 1239. However, during trial, Coachman did not challenge Regan's testimony by arguing that she was not a member of the charged conspiracy or that her testimony constituted a variance from the facts alleged in the indictment. At sentencing, he asserted that Regan was not a member of the

10

charged conspiracy, and he suggested that evidence may have established that he and Regan engaged in a separate, uncharged conspiracy.  Further, he argued that, at most, her testimony was a "variant" from the allegations contained in the indictment.  However, Coachman asserted these arguments to support his challenge to the calculation of the loss amount, not as a challenge to the constitutionality of his convictions.  Because Coachman did not preserve his instant argument before the district court, we review only for plain error.  *See Dortch*, 696 F.3d at 1110-12.

Regardless, the district court did not err, plainly or otherwise, in permitting Regan to testify.  Specifically, no material variance occurred because, viewing the evidence in a light most favorable to the government, a rational trier of fact could have found that Regan was a member of the same conspiracy that was charged in the indictment.  *See Edouard*, 485 F.3d at 1347.  First, evidence showed that Regan, Loretta, and Coachman, along with others, shared a common goal of defrauding the government by filing fraudulent tax returns and obtaining fraudulent refunds.  *See id*.  Second, the nature of the underlying scheme between Coachman and Loretta was the same as the underlying scheme between Coachman and Regan.  *See id*.  Specifically, Regan and Loretta both filed fraudulent tax returns and paid Coachman to have the tax refunds deposited into his bank accounts.  Finally, there was an overlap of participants involved in Coachman's

11

arrangement with Loretta and his arrangement with Regan. *See id*. Even if Regan and Loretta did not conspire with each other, they each conspired with Coachman, Danielle, and Latosha. Loretta and Latosha each testified that they worked with Danielle in filing false tax returns, and Regan testified that she had conversations with Danielle regarding which tax fraud schemes worked better than others. Further, Regan also testified that, on one occasion, she met with Danielle, Latosha, and Loretta to discuss which tax returns had been successful.

Coachman's arguments on appeal suggest that, while the indictment charged a single conspiracy, evidence showed that he engaged in separate conspiracies with Loretta and Regan. However, even if the evidence supported the existence of multiple conspiracies, no material variance occurred because, for the reasons discussed above, the evidence also supported a jury finding that only one conspiracy existed. *See id*. In any event, Coachman has not established that he was substantially prejudiced. *See id.; Narog*, 372 F.3d at 1247. Regan's testimony regarding Coachman's involvement in the tax fraud was substantially similar to other testimony that was presented at trial. Specifically, Loretta and Agent Williams both testified that Coachman agreed to allow fraudulent tax refunds to be deposited into his bank accounts. Additionally, Upshaw, a victim of the tax fraud scheme, testified that her false refund had been deposited into Coachman's bank account, and Agent Brandon testified that other refunds had been deposited into

Coachman's accounts.  Thus, even if Regan's testimony contributed to Coachman's conviction, it does not appear that, absent her testimony, Coachman would not have been convicted.  For these reasons, Coachman has not established that Regan's testimony constituted a material variance or that he was substantially prejudiced.  *See Edouard*, 485 F.3d at 1347.

### III.

We review the district court's calculation of loss under the Guidelines for clear error.  *United States v. Lee*, 427 F.3d 881, 892 (11th Cir. 2005).  Further, a sentencing court need only make a reasonable estimate of loss, given the available information.  *Id.* at 893.  The Guidelines ordinarily provide for a base offense level of 7 for fraud-related crimes subject to statutory maximum terms of imprisonment of more than 20 years.  U.S.S.G. § 2B1.1(a)(1).  If the fraud resulted in a loss of between $400,000 and $1,000,000, however, the offense level increases by 14.  *Id.* § 2B1.1(b)(1)(H)-(I).  If the fraud resulted in a loss of between $70,000 and $120,000, the offense level increases by 10*. Id.* § 2B1.1(b)(1)(E)-(F).

Under the Guidelines, a district court may hold a defendant accountable "not just for the 'offense of conviction,' but for all 'offense conduct,' which 'refers to the totality of the criminal transaction in which the defendant participated and which gave rise to his indictment, without regard to the particular crimes charged in the indictment.'"  *United States v. Fuentes*, 107 F.3d 1515, 1522 (11th Cir.

13

1997).  Where U.S.S.G. § 3D1.2(d) requires grouping of multiple counts, relevant conduct includes acts that are committed as part of the same course of conduct or common scheme or plan as the offense of conviction.  U.S.S.G. § 1B1.3(a)(2).

The district court did not clearly err in calculating the total loss amount that was attributable to Coachman.  The PSI did not specify whether the total loss amount of $464,554.35 included any of Regan's deposits, and Coachman appears to concede that Regan's deposits were not specifically calculated.  Regardless, the district court correctly found that, under § 1B1.3, Regan's deposits may be included in the loss calculation because they were part of the same course of conduct or part of a common scheme or plan as the charged offenses.  *See* U.S.S.G. § 1B1.3(a)(2).  As discussed above, Regan paid Coachman to use his bank accounts in a plan to obtain fraudulent tax refunds, which was a similar plan or scheme as the one that he had with Loretta, a charged conspirator.  Moreover, under the Guidelines, the total loss amount may be calculated based on the totality of Coachman's participation in the tax fraud scheme, regardless of the particular crimes charged in the indictment.  *See Fuentes*, 107 F.3d at 1522.

In this case, the government presented sufficient evidence to support a finding that $464,544.35 was a reasonable estimate of the loss, given the information available.  *See Lee*, 427 F.3d at 893.  Specifically, Agent Brandon, the IRS investigator, testified that, based on information that he was able to verify

14

through subpoenaing bank records, the individuals who were involved in the instant conspiracy obtained $750,000 in fraudulent refunds from the IRS, not including Regan's deposits.  Further, the PSI specified that Coachman's account had received approximately $464,554.35, resulting from approximately 100 deposits.  Coachman does not argue that these funds are from non-fraudulent conduct.  Rather, Coachman argues that he should only be held accountable for the 27 deposits that were attributable to Loretta, but he fails to acknowledge that, under the Guidelines, he may be held accountable for all of his relevant conduct, without regard to the charged offenses.  *See Fuentes*, 107 F.3d at 1522.

For the foregoing reasons, we affirm Coachman's convictions and sentences.

**AFFIRMED.**

15