IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 28, 2008

Charles R. Fulbruge III
Clerk

No. 06-50218

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ERIC CONNER, also know as Edollaz

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before REAVLEY, JOLLY, and GARZA, Circuit Judges.

REAVLEY, Circuit Judge:

Eric Conner was convicted of conspiracy to commit access-device fraud and mail fraud. He received a 100-month sentence. Conner now appeals the conviction and his sentence. He argues, among other things, that his conviction should be vacated because there was insufficient evidence of the conspiracy and because the district court erroneously charged the jury under a theory of "deliberate ignorance." We disagree and affirm his conviction. Connor also argues that we must vacate his sentence because the district court incorrectly counted the number of "victims" under section 2B1.1(b)(2) of the Sentencing Guidelines. We agree and remand for re-sentencing.

## I. Factual Background

William Whatley began purchasing goods at Texas Home Depot stores using commercial credit accounts without authorization in 2000. Whatley charged Home Depot merchandise or gift cards to the credit accounts of multiple companies. He redeemed the gift cards for cash or sold the merchandise.

Later that year, Whatley showed his friend Daniel Hester how to employ the scam. Hester then taught the scam to Shannon Pollock. Hester, Whatley, and Pollack would all share account information with one another. After Hester expanded the scheme to Sam's Club stores, Pollock and Whatley began doing the scheme there.

During this same period, Hester also explained the fraud to Daniel Beery. Hester and Beery began to share account information and to do the scam together. They also took trips to multiple states to perpetrate the fraud. Beery soon took the fraud "to the next level," employing the scam all over the country.

In Spring 2003, Beery ran into Eric Conner (the defendant in this case) in Bozeman, Montana, near where they attended high school. Conner had begun classes at Montana State University. During his freshman year, in January 2001, he opened an account on eBay—then a relatively new internet platform for conducting private auctions—under the name "edollaz."

Beery explained to Conner that he was in the "wholesale gift card business," and he was selling gift cards for approximately 70% of their face value. Conner purchased multiple Home Depot gift cards from Beery, and he resold several of them on eBay. He also used some of the gift cards to purchase Home Depot items, which he resold on eBay. Conner began purchasing gift cards from Beery in volume. He found it especially profitable to buy high-quality power tools using the gift cards, and to resell the tools on eBay.

Shortly thereafter, Beery introduced Hester to Conner, and Conner began

2

selling goods for Hester as well.  Hester testified that he told Conner about "the scam" and that Conner was present when he and Beery had conversations about what transpired in the stores.  But Conner claimed at trial that he had no actual knowledge of how Hester and Beery acquired the tools.  Hester also testified that when they practiced the scam, Conner or Beery usually waited in the car, ready to make a getaway, and that all three had conversations about what would occur if the police came.

In April 2004, Beery was arrested in Minnesota.  At the time of his arrest, Beery had a large amount of tools.  He was charged in Minnesota state court with credit card fraud.  Conner, aware of the arrest, paid for Beery's attorney.

While Beery was in jail, Conner and Hester made plans to go on several trips "to pick up tools" at Lowe's and other stores.  Conner told Hester that he had listed and pre-sold tools on eBay before they had been acquired.  So, during their trips, Conner rented the cars, navigated their way to Lowe's stores, told Hester which tools he needed, and helped load the tools into the cars.  The tools were then shipped either to Las Vegas, where Conner lived, or directly to eBay customers.  Conner paid for the shipments.

Hester and Conner took a trip to Florida in January 2005.  On the trip, Conner plotted on a map the Lowe's stores they would visit, and they also had a map indicating shipping locations.  Conner kept a spiral notebook detailing the needs of customers. On two occasions, Conner accompanied Hester while Hester obtained fake IDs for use during the scam.  During the Florida trip, Hester and Conner shipped an expensive drill kit to undercover Secret Service Agent Andrew Dooher in Texas.

In April 2005, after Beery was released from jail, he, Hester, and Conner made additional trips together where items were obtained using the fraud.  Conner was arrested in Las Vegas in July 2005.

3

## II. Procedural History

In June 2005, a grand jury indicted Berry, Conner, Hester, Whatley, and Pollock. The indictment charged the defendants with conspiracy to commit access-device fraud, in violation of 18 U.S.C. § 1029, from approximately November 2001 until approximately June 2005. Conner was also charged with mail fraud, in violation of 18 U.S.C. § 1341. Conner alone proceeded to trial, his co-defendants having pleaded guilty pursuant to cooperation agreements (except for Beery, who was then a fugitive). After a jury convicted Conner, the district court imposed a sentence of 90 months for the conspiracy count and a concurrent sentence of 100 months on the mail fraud count.

Conner now appeals. He challenges both his conviction and sentence.

## III. Sufficiency of the Evidence

Conner argues that there was insufficient evidence to support his conviction. We review de novo "whether a rational trier of fact, after considering all the evidence and reasonable inferences drawn therefrom in a light most favorable to the verdict, could have found the defendant guilty beyond a reasonable doubt." United States v. Harris.[1]

### A. The Access-Device Fraud Conspiracy

The superseding indictment charged all five defendants with conspiring to use unauthorized access devices with the intent to defraud. To prove a conspiracy, the Government must show "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the

---

[1]420 F.3d 467, 470 (5th Cir. 2005) (internal quotation marks omitted).

4

objective of the conspiracy." United States v. Williams.[2]

Conner argues that there was insufficient evidence of a conspiracy because the alleged co-conspirators shared only a technique; they were not members of a conspiracy. He points to United States v. Gutierrez-Farias, where we held that the Government must prove that "each conspirator knew of, intended to join, and participated in the conspiracy."[3] But the evidence does not support Conner's theory. It is true that the conspiracy involved the sharing of a technique for how to use business accounts without authorization, but the participants also assisted each other in practicing the scheme. The evidence shows that Hester, Whatley, and Pollock shared account information with each other. In fact, there is evidence that Beery and Pollock both used the same fraudulent Sam's Club card. Because Pollock was "jittery and nervous" about committing the scheme, Hester actually set up an account for Pollock to use. The above shows that Pollock and Whatley were involved in something more than the simple sharing of a technique, and there is overwhelming evidence that Hester, Beery, and Conner were involved in a prototypical conspiracy. They obtained the information together that enabled the conspiracy (e.g., purchasing fake IDs); they committed the fraud together; they shared information about how to successfully perpetrate the fraud; and they coordinated selling the fraudulently obtained goods.

Conner presents other challenges to the sufficiency of the evidence for the access-device fraud conspiracy. These arguments fail because the Government demonstrated by sufficient evidence that during multiple one-year time periods Conner conspired to use unauthorized access devices and/or to sell the proceeds

---

[2]507 F.3d 905, 910 n.4 (5th Cir. 2007) (internal quotation marks omitted).

[3]294 F.3d 657, 661 (5th Cir. 2002).

5

derived therefrom.  See 18 U.S.C. § 1029.

## B. The Mail Fraud Offense

Conner alleges that there was insufficient evidence for his mail fraud conviction.  His first argument is that the Government did not show a "scheme to defraud," an element of the mail fraud offense, see 18 U.S.C. § 1341, because the Government failed to show that he engaged in the access-device conspiracy. We disagree with Conner's argument because there was sufficient evidence of the access-device conspiracy, as discussed above.

Conner also argues that the Government's evidence was insufficient because during summation it abandoned its claim that the scheme to defraud employed "false material representations," another element of the mail fraud offense. See id.  This argument is without merit because during summation the Government said the scheme involved fraudulently obtaining items using unauthorized access devices and that Conner offered the stolen tools as his to sell and averred that he was a "legitimate" seller, all false representations.

Finally, Conner argues that the Government failed to establish the provenance of the drill kit that was mailed to Agent Dooher; specifically, that it was one of the tool kits Hester obtained by fraud during his trip with Conner to Florida.  In fact, there was overwhelming evidence that tied the drill kit sold to Agent Dooher as an item obtained by Conner and Hester during the Florida trip. The evidence came from Hester's testimony, as well as corroboration from the owner of the place from where the drill kit was shipped.

## IV. Deliberate Ignorance Jury Instruction

Conner argues that the district court erred by using a "deliberate ignorance" jury instruction.  The court instructed the jury that the term "knowingly" could be satisfied if Conner was "subjectively aware of a high probability of the existence of the illegal conduct and he purposely contrived to

6

avoid learning of the illegal conduct[; that he] deliberately closed his eyes to what would otherwise have been obvious to him." A "deliberate ignorance" instruction "is designed to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." United States v. Nguyen.[4] "It is only to be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference."[5]

We review a defendant's objection to the jury instruction by assessing whether the district court's charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them. The district court may not instruct the jury on a charge the evidence does not support. But in determining whether the evidence reasonably supports the charge, the evidence and all reasonable inferences that may be drawn from it are viewed in the light most favorable to the Government. United States v. Sharpe.[6]

"Before a deliberate ignorance instruction may properly be given, the evidence at trial must raise two inferences: [1] the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and . . . [2] the defendant purposely contrived to avoid learning of the illegal conduct." United States v. Inv. Enters., Inc.[7] "The deliberate ignorance instruction presents the danger that a jury will convict a defendant on the basis of the lesser mens rea of negligence—punishing the defendant for what he should have known.

---

[4]493 F.3d 613, 618 (5th Cir. 2007) (internal quotation marks omitted).

[5]Id. (internal quotation marks omitted).

[6]193 F.3d 852, 871 (5th Cir. 1999) (internal citations and quotation marks omitted).

[7]10 F.3d 263, 268 (5th Cir. 1993) (internal quotation marks omitted).

[Therefore,] [c]ircumstances rarely warrant the use of this instruction." United States v. Gray.[8]  A court should not give a deliberate ignorance instruction when the evidence shows only that the defendant "should have been aware of the illegal conduct."  United States v. Lara-Velasquez.[9]  But when the proper evidentiary showing is made, the jury instruction is appropriate.[10]

Conner argues that while the Government presented evidence of his actual knowledge of the fraud, it did not present sufficient evidence that Conner "purposefully contrived to avoid learning of the illegal conduct" of Hester and Beery, the second required showing for a deliberate ignorance instruction. Conner's argument lacks merit.  As we have held, if "[t]he circumstances in th[e] case were so overwhelmingly suspicious that the defendant['s] failure to conduct further inspection or inquiry suggests a conscious effort to avoid incriminating knowledge," this can establish the second prong.[11]  Here, Conner admitted that it "seemed fishy" that Hester and Beery could receive a commission for selling $500 gift cards for only $350.  He also admitted that he initially thought that Beery and Hester were running some type of "pyramid scheme."  And he testified that when he began selling the goods purchased from them he guessed that they were running "some sort of a scam or some sort of a rip-off deal."  Yet, other than verifying that the gift cards could be redeemed for full value, Conner says that he did nothing to inquire further into how Beery and Hester were acquiring tens of thousands of dollars of tools and gift cards at a fraction of their retail value.

---

[8]105 F.3d 956, 967 (5th Cir. 1997).

[9]919 F.2d 946, 951 (5th Cir. 1990).

[10]See, e.g., Nguyen, 493 F.3d at 618–23 (approving of the deliberate ignorance instruction and citing other cases that do so as well).

[11]Id. at 621 (internal quotation marks omitted).

8

There is other evidence of Conner purposely putting his head in the sand. When Hester and Beery were in the stores committing the fraud, Conner says that he waited in the car or browsed in the stores while they "purchased" the goods. But he claims that he did not seek to clarify what exactly they were doing in the stores that enabled them to purchase goods so cheaply. When Beery was arrested in Minnesota with thousands of dollars of tools, Conner communicated with him and even paid for his attorney. Yet, Conner claims that he never learned that Beery was arrested for fraud. These are all examples of Conner's purposeful contrivance to avoid learning of illegal conduct. Alone, each might not have justified a deliberate ignorance instruction, but when taken together they present facts that justify the instruction.

Conner's second argument is that the district court erred by giving the "deliberate ignorance" instruction when the Government's evidence at most established actual criminal knowledge, and evidence can establish actual knowledge or deliberate ignorance, but not both. It is true that "the district court should not instruct the jury on deliberate ignorance when the evidence raises only the inferences that the defendant had actual knowledge or no knowledge at all of the facts in question. If the choice is simply between a version of the facts in which the defendant had actual knowledge, and one in which the defendant was no more than negligent or stupid, the deliberate ignorance instruction is inappropriate."[12] But it is also true that the "same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct."[13]

---

[12]Lara-Velasquez, 919 F.2d at 951 (internal citation omitted).

[13]Id. at 952.

In this case, the Government presented overwhelming evidence that the defendant was subjectively aware of a high probability of the existence of illegal conduct. When this is true, the "propriety of a deliberate ignorance instruction depends upon evidence that the defendant purposely contrived to avoid learning of the illegal conduct."[14] As discussed above, there was sufficient evidence that Conner purposely contrived to avoid learning of Hester and Beery's illegal conduct. This evidence was developed largely through Conner's own testimony, where he denied knowledge of the fraud but outlined his efforts to avoid learning the details of Hester and Beery's scheme. The Government conceded at oral argument that without Conner's testimony a deliberate ignorance instruction might have been unjustified. While this may be true, given Conner's testimony the district court did not err by giving the deliberate ignorance instruction.

## V. Evidentiary Challenges

Conner argues that we must reverse his conviction because the district court erroneously permitted expert opinion testimony by Agent Dooher. The Government did not provide any notice that it intended to elicit expert opinion testimony from Agent Dooher, as the rules of evidence require. See FED. R. CRIM. P. 16(a)(1)(G).

We examine with particularity eight separate lines of questions where the prosecutor asked Agent Dooher to opine about the "value," "importance," or "significance" of particular evidence, and also asked why certain evidence "stood out" to him. For example, the prosecutor asked why a particular Federal Express receipt was "significant." Agent Dooher responded that the "[m]ost significant thing is the dates and the location, Birmingham, Alabama," and he then went on to further opine about why that was "significant."

---

[14]Id.

Conner did not object to these statements at trial, so we review the admission of the evidence for plain error. "Under plain error review, we will grant relief only if (1) there was error, (2) the error was plain or clear, and (3) the error affects the defendant's substantial rights. Even if it does meet these requirements, we will not exercise our discretion to grant relief unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." United States v. Cisneros-Gutierrez.[15]

This testimony might be considered opinion testimony from a purely factual witness. But although there are dangers from allowing a witness to wear the expert-witness and fact-witness hats simultaneously, see United States v. Dukagjini,[16] Agent Dooher's testimony did not affect Conner's substantial rights. His opinions about why certain evidence was "significant" or "important" made obvious connections between specific facts, such as why it was significant that a receipt was from a store defrauded on the date of the receipt.

Conner objects to the admissibility of other evidence. After due consideration, we reject those challenges.

## VI. Sentencing

The district court imposed a sentence of 90 months for the conspiracy count and a concurrent sentence of 100 months on the mail fraud count. The court calculated Conner's Guideline range as 121-to-151 months based on an adjusted offense level of 31 and a criminal history category of II. The judge reasoned that it was appropriate to give a below-Guideline sentence of 100 months because the mail fraud count was a specific part of the conspiracy count, which carried a 90 month maximum statutory sentence, and Conner's co-

---

[15]517 F.3d 751, 760 (5th Cir. 2008) (internal quotation marks and footnote omitted).

[16]326 F.3d 45, 53–54 (2d Cir. 2003) (cataloguing some of the many concerns).

conspirators, who received lower sentences, originated the conspiracy, were involved in it for longer, and were more culpable.

## A. Number of Victims

Conner argues that his sentence must be vacated because the district court improperly increased his base offense level by four pursuant to its finding under U.S.S.G. § 2B1.1(b)(2)(B) that his offense involved between 50 and 250 "victims." The district court found that there were more than fifty victims by counting each account holder whose account information was used to purchase goods. Conner argued below that the account holders should not be counted as victims because the credit company for each account (five in total) fully reimbursed the accounts for all temporary charges. The district court disagreed, concluding that the reimbursed account holders were victims. We review a district court's interpretation or application of the Guidelines de novo and its factual findings for clear error.[17]

To determine if the account holders are "victims" as the term is used in § 2B1.1(b)(2), we must examine how "victim" is defined in the 2005 Guidelines' Application Notes, which was used at sentencing. See Stinson v. United States.[18] "Victim" is defined to include "any person who sustained any part of the <u>actual loss</u> determined under subsection (b)(1)."[19] "Actual loss" is "the reasonably foreseeable pecuniary harm that <u>resulted from the offense</u>."[20] "Pecuniary harm"

---

[17]Cisneros-Gutierrez, 517 F.3d at 764.

[18]508 U.S. 36, 38, 113 S. Ct. 1913, 1915 (1993) (holding that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline").

[19]Application Note 1 (emphasis added)

[20]Application Note 3(A)(i) (emphasis added).

means "harm that is monetary or that otherwise is readily measurable in money" and "does not include emotional distress, harm to reputation, or other non-economic harm."[21] Here, the credit companies fully reimbursed all credit account holders for the temporary charges to their accounts. For example, a Sam's Club employee testified at trial that none of the store's individual business customers were "out any money." And the Government does not cite any other evidence showing that the account holders have incurred a pecuniary loss. Thus, the account holders have not suffered any pecuniary harm that resulted from the offense. Under a plain reading of the Application Notes, the account holders did not suffer any "actual loss" and therefore were not "victims" under § 2B1.1(b)(2).

This reading of the Guidelines is consistent with the Sixth Circuit decision in United States v. Yagar[22] and the Eighth Circuit decision in United States v. Icaza.[23] In Yagar, the defendant used stolen checks to deposit in excess of $88,000 into accounts of over fifty individuals at five banks using stolen bank information.[24] The defendant then withdrew portions of the deposited funds from forty-seven of those accounts, receiving over $20,000 in cash.[25] On appeal, all parties conceded that the five banks were victims under the Guidelines. The Government argued that those accounts holders who only temporarily lost funds because their banks reimbursed them for their losses were also victims.[26]

---

[21]Application Note 3(A)(iii).

[22]404 F.3d 967 (6th Cir. 2005).

[23]492 F.3d 967 (8th Cir. 2007).

[24]404 F.3d at 968.

[25]Id.

[26]Id. at 971.

13

Analyzing the same Guidelines provisions that we do, the Sixth Circuit held that those account holders did not suffer an "actual loss" and thus were not "victims" because "they were fully reimbursed for their temporary financial losses."[27] Such is the case here.

In Icaza, the defendants traveled across the country shoplifting items from multiple Walgreens stores. The district court counted each individual Walgreens store that was robbed (approximately 400) as a "victim" under § 2B1.1(b)(2).[28] On appeal, the defendants argued that only the Walgreens corporation was a "victim." The Eighth Circuit agreed because only "the Walgreens corporation sustained an actual loss."[29] The court examined the term "actual loss." It held that no individual Walgreens store sustained any part of the "actual loss" because none "<u>ultimately</u> bore the pecuniary harm."[30] Under the Eighth Circuit's analysis, if an individual business does not ultimately sustain any pecuniary harm, as none of the account holders did in our case, it cannot be said to have suffered an "actual loss." The Icaza court supported its conclusion by pointing to testimony explaining that any restitution from the defendants would go to the Walgreens corporation; similarly, in our case, the district court ordered restitution only to the five companies that credited the accounts used to perpetrate the fraud.

The Government argues that the account holders are victims because they suffered pecuniary harm at the moment the purchases were charged to their accounts. In other words, the account holders suffered a pecuniary loss before

---

[27]Id.

[28]Icaza, 492 F.3d at 968–69.

[29]Id. at 969.

[30]Id. at 970 (emphasis added).

14

they were ultimately reimbursed. This reasoning runs counter to Yagar and also Icaza, where the court held that only the party that "ultimately" bore the pecuniary harm from the offense suffered an "actual loss."[31] Moreover, the Government does not explain why we should "stop the clock" immediately after the credit accounts were used, as opposed to measuring pecuniary harm following the events that actually took place, including the crediting of the accounts by the issuers of credit. It is a strained reading of Application Note 3(A)(i) to say that the account holders suffered "pecuniary harm that resulted from the offense" when the Government offers no evidence that the account holders were not made whole (pecuniarily) by the reimbursements.

The Government relies on United States v. Lee,[32] where the defendants wrote more than one million dollars' worth of personal checks drawn upon closed bank accounts. The defendants used these checks to pay off multiple mortgages and purchase expensive automobiles.[33] The defendants argued that the district court should not have counted as victims those businesses that were able to offset their losses through means such as collateral and repossession.[34] The court disagreed and wrote that those who recover collateral, or who have their money or property returned, have suffered a loss under the Guidelines.[35] The broadest reading of the Lee rule, endorsed by the Government, is that anyone who initially suffers a pecuniary loss, no matter what subsequently happens, and even if the loss is only fleeting, is a victim because they have at some point

---

[31]Id.

[32]427 F.3d 881, 884 (11th Cir. 2005).

[33]Lee, 427 F.3d at 885–86.

[34]Id. at 894.

[35]Id. at 895.

15

incurred pecuniary harm. But as discussed above, this interpretation of the definition of "actual loss" is not compatible with its plain meaning.

Furthermore, Lee can be distinguished from our case on its facts. In Lee, one defendant argued that the holder of a loan secured by that defendant's car was not a victim because the holder repossessed the car as collateral. The court disagreed, pointing out that even after selling the collateral, the holder was saddled with approximately $9,000 in debt.[36] In our case, by contrast, there is no evidence that any account holder incurred any debt after reimbursement. In Lee, the defendant minimized the loss and the court also counted as victims businesses that had to pursue expensive foreclosure litigation and other legal action before being reimbursed, in whole or in part. The court noted that in none of these cases was a third party available to provide prompt indemnification, and in this way distinguished the case from Yagar.[37] Here, the account holders were reimbursed by third parties (as in Yagar), and the Government does not point to evidence that any account holder had to spend money or an extended length of time seeking reimbursement. We do not have to reach the issue of whether the parties counted as "victims" in Lee would be considered victims under our rule.[38] The evidence here indicated that the account holders were quickly

---

[36]Id.

[37]Id.

[38]Application Note 3(E), the "credit against loss" provision, says that "loss" shall be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." The Government points to this statement as implying that those who suffer an initial loss before reimbursement are always victims. It relies on an analysis of this statement in Lee. See 427 F.3d at 884. This argument is unpersuasive because the "credit against loss" provision is distinct from those Application Notes that define "victim." The authors of the Guidelines instruct us to look at the terms "actual loss," "pecuniary harm," and "reasonably foreseeable pecuniary harm" to determine how to count "victims." We should not look to a separate provision of the Application Notes to create an ambiguity in the

16

reimbursed for the improper charges on their accounts. If they had paid those charges and encountered difficulty in obtaining reimbursement, a different question would be presented.

In finding that the account holders were victims, the district court reasoned that some account holders must have paid bills with fraudulent account charges before ultimately being reimbursed, and this logically involved a loss of business time. Although it did not specifically say so, perhaps this was the district court finding that the account holders ultimately incurred pecuniary harm. The court admitted that it did not have "any evidence" for this conclusion, but that it was just "garden-variety logic." It is possible that with a proper evidentiary foundation these types of unreimbursed business losses could be considered "actual losses" for the purposes of counting "victims."[39] But the district court's speculation as to the existence of these facts was an insufficient basis to enhance Conner's sentence.[40] "[A] finding under the Guidelines must be based on reliable information and a preponderance of the evidence, see U.S.S.G.

provisions relevant to defining "victim," when no ambiguity exists when looking at those provisions alone. Furthermore, there is no indication that use of the word "victim" is 3(E) was intended to modify the definition of the term as used in § 2B1.1(b)(2). Finally, Application Note 3(E) is about how to count "loss," which is a related but distinct concept from "actual loss"—how the Application Notes instruct us to identify "victims." See Application Note 3(A).

[39]But it must be noted that under the Application Notes certain damages are specifically excluded from "loss," such as "[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." Application Note 3(D)(i).

[40]Lee, 427 F.3d at 893 ("A sentencing judge . . . may not speculate about the existence of a fact that would permit a more severe sentence."); Yagar, 404 F.3d at 972; see United States v. Gray, 71 Fed. Appx. 300, 301 (5th Cir. 2003) (concluding that the number-of-victims adjustment under § 2B1.1(b)(2)(A) was wrongly applied where there was insufficient evidence to support the district court's conclusion that the underlying offense involved more than ten victims).

17

§ 6A1.3, commentary."[41] And it is the "[t]he Government [that] bears the burden of proving . . . that the facts support a sentencing enhancement." United States v. Rodriguez.[42] This standard was not met here. In Yagar, the Sixth Circuit held that the district court did not have a proper factual basis to conclude that six account holders were not fully reimbursed because they had to order new checks, despite some testimonial evidence that the account holders had to pay for new checks.[43] Here, the district court did not point to any evidence of the pecuniary costs incurred by the account holders. Therefore, we cannot accept enhancing Conner's sentence on this basis.

We hold that there were only five victims under § 2B1.1(b)(2): Home Depot, Lowe's, Sam's Club, Citicorp Credit Services, (Home Depot's issuing credit company), and G.E. Consumer Credit (the issuing credit company for Lowe's and Sam's Club). The district court could properly consider the large number of individual account holders affected by Conner's crime as part of its consideration of § 3553(a) factors if the court decided to issue a non-guidelines sentence. That effect of the fraudulent activity could justify a "need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, [] to provide just punishment for the offense . . . [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2).

### B. Sophisticated Means

Conner also argues that the district court erred by enhancing his offense level by two under § 2B1.1(b)(9)(C) after finding that the crime involved "sophisticated means." The Application Note for that section states that

---

[41]Yagar, 404 F.3d at 972.

[42]523 F.3d 519, 524 (5th Cir. 2008).

[43]404 F.3d at 971–72.

sophisticated means are "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."[44] "The district court's factual determination that [the defendant] used sophisticated means is reviewed for clear error."  United States v. Powell.[45]

This was not the most sophisticated fraud.  The conspirators used fake IDs to obtain goods using business accounts, and then the goods were sold on eBay.  But the district court did not clearly err in making the determination that some of the means used were sophisticated.  The conspirators moved from state-to-state (traveling to twenty-three states), and they obtained a great deal of information about credit accounts before purchasing merchandise that was sold to a steady supply of internet customers.  Conner used a fictitious name and created a fictitious business.  Frequently, he pre-sold merchandise to his customers and then researched stores where the merchandise could be obtained, mailing the fraudulently obtained goods to the customers within hours of purchase.  Taken together, these aspects of the fraud indicate that the district court did not clearly err in finding that the crime involved sophisticated means.

Conner also argues that the "grouping" provisions of the Guidelines were misapplied in a manner that violates fundamental fairness.  We disagree.

Because the district court erroneously enhanced Conner's base offense level by four due to its finding that the crime involved fifty or more victims, we vacate Conner's sentence and remand to the district court for re-sentencing.

## VII. Conclusion

Conner's conviction is AFFIRMED.  His sentence is VACATED and the case is REMANDED to the district court for re-sentencing.

---

[44]Application Note 8(B).

[45]124 F.3d 655, 666 (5th Cir. 1997).

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

I concur in all but Part VI.A of the majority opinion. I dissent from that portion because I believe the district court properly treated the individual account holders as victims of Conner's fraud under United States Sentencing Guidelines Manual ("USSG") § 2B1.1(b)(2) (2005).

Section 2B1.1(b)(2) provides that a defendant's Guidelines range should be increased by four levels if the defendant's offense involved more than 50, but less than 250 victims. The application notes to § 2B1.1 define a victim as "any person who sustained any part of the actual loss determined under subsection (b)(1)." USSG § 2B1.1, cmt. n. 1. Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id*. at n. 3(a)(i). Further, "pecuniary harm" is defined as "harm that is monetary or that otherwise is readily measurable in money . . . . [P]ecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm." *Id*. at n. 3(a)(iii). The question then is whether the individual account holders, obviously victims in the general sense of the word, suffered a "pecuniary harm that resulted from" Conner's offense. Relying on *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005), the majority concludes that because the individual account holders in this case ultimately were reimbursed, they did not suffer a pecuniary harm, and thus did not sustain any actual loss.[1] I disagree.

The fact that the account holders were later reimbursed for the fraudulent charges they incurred does not mean that the account holders failed to suffer an actual loss. *See*

---

[1] The majority also relies in part on *United States v. Icaza*, 492 F.3d 967 (8th Cir. 2007). But the majority's use of Icaza to connect restitution and actual loss puts the cart before the horse. See id at 969-70. A party must suffer pecuniary loss to receive restitution, but a party may suffer an actual loss without seeking restitution. See United States v. Smiley, 210 Fed. App'x 972, 2006 WL 3724643 at **3 (11th Cir. 2006) (unpublished) (per curiam) ("The fact that the [victims] did not seek restitution does not mean they did not sustain an actual loss.").

*United States v. Lee*, 427 F.3d 881, 894-95 (11th Cir. 2005) (rejecting *Yagar* and holding that an actual loss occurs even though it happens to be remedied by recovery of collateral or return of goods). Without counting the account holders arguably charged prior to Conner's entry into the conspiracy, the presentence investigation report ("PSR") provides at least 67 separate account holders and the exact amounts fraudulently charged to their individual accounts during the conspiracy.[2] Based on this evidence in the PSR, the district court was free to find that each account holder suffered a "pecuniary harm" that "resulted from" Conner's offense, irrespective of the fact that they eventually were reimbursed.

The majority indicates that there is no reason to "stop the clock" to measure an account holder's actual loss prior to reimbursement. But by waiting until after reimbursement to measure "pecuniary harm" and "actual loss," the majority's interpretation of the victim enhancement in § 2B1.1 runs counter to the fundamental sentencing goal of tying the severity of a defendant's sentence to the seriousness of the defendant's crime. *See* USSG § 1A1.1, Part A - Introduction, Subpart 3 (providing that through the creation of the Guidelines, Congress sought "proportionality in sentencing through a system that imposes *appropriately different sentences for criminal conduct of different severity*" (emphasis added)). To exemplify how the majority has turned the enhancement on its head, compare a defendant who defrauds 1,000 individuals that, after the fact, have their losses reimbursed by a single insurer and a defendant who defrauds 10 uninsured individuals. Assuming an equal amount of loss, there can be no doubt that the first defendant's crime is more serious and therefore deserving of a more

_____

[2]Conner entered into the conspiracy in the Spring of 2003. The PSR lists the charges incurred by 84 different account holders. Seventeen accounts were fraudulently charged prior to May 24, 2003. The remaining accounts were charged between July 15, 2003 and June 20, 2005.

severe sentence. The majority's interpretation of the victim enhancement leads to the incongruous result of the second defendant receiving the higher Guidelines range.

That Conner was lucky enough to defraud victims who had fraud insurance should not result in his receiving a reduced sentence under the Guidelines, and we should not interpret § 2B1.1 to lead to such a result. Accordingly, I dissent from Part VI.A of the majority's opinion, and would affirm both Conner's conviction and sentence.