FILED
United States Court of Appeals
Tenth Circuit

May 27, 2009

Elisabeth A. Shumaker
Clerk of Court

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DJUAN JAHMAR ORR,

      Defendant-Appellant.

No. 08-7070

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. 6:CR-07-0058-RAW)**

Robert A. Ridenour, Assistant Federal Public Defender (Julia L. O'Connell, Federal Public Defender; Barry L. Derryberry, Research & Writing Specialist, with him on the brief), Office of the Federal Public Defender, Tulsa, Oklahoma, for Defendant-Appellant.

Christopher J. Wilson, Assistant United States Attorney (Sheldon J. Sperling, United States Attorney, with him on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.

Before **KELLY, BRISCOE,** and **HARTZ**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Defendant Djuan Orr was convicted, following a jury trial, of one count of knowingly possessing fifteen or more counterfeit or unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), and one count of using a counterfeit access device, in violation of 18 U.S.C. § 1029(a)(1). Orr was subsequently sentenced to seventy-seven months' imprisonment. Orr now appeals his sentence, arguing the district court lacked an evidentiary basis for calculating the number of victims and the amount of loss, and in turn applying enhancements based on those calculations. The government has conceded that the district court erred in its loss calculations, but argues there was evidentiary support for the court's findings regarding the number of victims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we agree with Orr that the district court erred in both regards, and thus remand for resentencing.

I

In August 2007, Secret Service agents began investigating fraudulent credit card transactions that had been occurring in the Dallas, Texas, metropolitan area. Defendant Orr was identified as a suspect in the transactions and, on August 24, 2007, Secret Service agents, by way of cell phone tracking, located Orr at a motel in Ardmore, Oklahoma. The front desk clerk at the motel recognized Orr from a photograph, and informed the agents that Orr had arrived at the motel on the morning of August 24th in a vehicle bearing Texas plates, had rented a room for two people using the name Mike Keys, and had provided a District of Columbia

2

driver's license and an American Express card bearing that same name. The Secret Service agents obtained the American Express card number from the clerk, contacted American Express, and were informed that the card number was actually held by an individual named Bipin Adhikary.

The Secret Service agents subsequently arrested Orr as he was observed leaving his motel room. A search of Orr's person incident to arrest produced a District of Columbia driver's license and an American Express gift card, both bearing the name Mike Keys. The original numbers on the gift card appeared to have been flattened and new numbers re-embossed.

Orr advised the agents that there was another person in the motel room with him. The agents proceeded to Orr's motel room, where they made contact with an individual named Maurice Dixon. Dixon allowed the agents into the room and gave written consent for them to search the room. The agents seized twenty-two counterfeit credit, debit and gift cards that bore the names of four different individuals, none of whom were Orr or Dixon. Most of the cards appeared to have had their original names and numbers flattened and new numbers and names re-embossed on the front of the cards.

A search of Orr's vehicle produced a wallet, located in a map pocket on the back of the front passenger seat, containing an Ohio driver's license bearing the name of Stephen Higgins. Although the license number was subsequently determined to be valid, the photo on the license appeared to be that of Dixon.

3

Also contained in the wallet were two counterfeit credit cards and a Winstar Casino players card all bearing the name of Stephen Higgins.

Subsequent investigation revealed that, of the twenty-six counterfeit cards seized in connection with Orr's arrest, seven had been used fraudulently. With respect to each of those seven cards, the issuing bank or credit card company confirmed that the actual owner of the card had made a fraud claim and had not given permission to anyone else to use the account number.

On September 12, 2007, a federal grand jury indicted Orr on one count of knowingly possessing fifteen or more counterfeit or unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), and one count of using a counterfeit access device, in violation of 18 U.S.C. § 1029(a)(1). The case proceeded to trial on November 19-20, 2007. At the conclusion of the evidence, the jury found Orr guilty as charged in both counts of the indictment.

The probation officer assigned to Orr's case submitted a final presentence report (PSR) on March 14, 2008. In describing "The Offense Conduct," the PSR referred not only to the relevant events surrounding Orr's arrest in Ardmore, Oklahoma, on August 24, 2007, but also alleged that Orr was in fact the leader of a Texas-based conspiracy to create and use counterfeit access devices. ROA, Vol. 3, PSR at 2-5. According to the PSR, Orr and his coconspirators "mined" credit card data "through the use of skimming devices," "downloaded" the credit card data "into a computer to create fraudulent credit cards," and then used the

4

fraudulent credit cards "at retail stores to purchase high end items." Id. at 5.

Consistent with these allegations, the PSR alleged "[t]here [we]re 704 known

credit card numbers that were compromised in this case," and that these credit

cards had been issued by approximately seventy-five separate banks. Id. at 5-6

(listing each of these banks). In addition, the PSR alleged that "[f]ifteen of these

[seventy-five] banks suffered a[n actual] monetary loss of $154,962.53."[1] Id. at

6. Of those fifteen banks, the PSR alleged that five, i.e., American Express,

Citibank, Discover, U.S. Bank, and Wells Fargo, suffered actual monetary losses,

totaling slightly more than $10,000, in connection with the counterfeit credit

cards seized by Secret Service agents from Orr on August 24, 2007. Consistent

with these allegations, the PSR imposed a base offense level of six pursuant to

U.S.S.G. § 2B1.1(a)(2), and then applied, in pertinent part, a fourteen-level

enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H) based on the total amount of

loss (which the PSR calculated to be $472,032.18[2]), and a two-level enhancement

---

[1] The fifteen banks listed in the PSR included "Discover, Citibank, HSBC, MBNA America Bank, Bank of America, U.S. Bank, Toronto Dominion Bank, American Airlines Employee Credit Union, Credit Union of Texas, Capital One Bank, Banco Uno S.A., American National Bank of Texas, Navy Federal Credit Union, General Technologies Federal Credit Union, and American Express . . . ." ROA, Vol. 3, PSR at 6. It appears that the PSR may have overlooked one additional bank, i.e., Wells Fargo, in this calculation. See id. at 4 (listing Wells Fargo as having suffered an actual loss of $202.00 in connection with one of the cards seized on August 24, 2007).

[2] The PSR arrived at this total loss figure by applying "[a] loss of $500.00 per access device . . . for 648 of the cards" for which either no actual loss had

(continued...)

5

pursuant to U.S.S.G. § 2B1.1(b)(2)(A) because the offense involved ten or more victims.

Orr's counsel filed written objections to portions of the PSR. In particular, Orr's counsel "object[ed] to the factual basis for the findings of relevant conduct," noting that "[t]he jury only found that [Orr] and Dixon possessed some 20+ cards or numbers, with no more names or numbers involved," yet "[s]omehow" the PSR included "unsubstantiated allegations of criminals [i.e., Orr's alleged coconspirators] to decide that [Orr] [wa]s tied into, or [wa]s the leader, of a credit card ring in north Texas." Id., attached letter of Orr's counsel at 1. Orr's counsel also asserted that, "[e]ven were the flawed claims from the crooks included, we still object to the loss findings." Id. at 2. More specifically, Orr's counsel stated:

> Paragraph 20 [of the PSR] claims that fifteen banks claimed losses of $154,962.53. Where did that number come from? There is no proof of these losses, how they were incurred, or how they are reasonably foreseeable to my client's decisions or actions. Are the losses to real people or corporations? Have the victims who claim losses been contacted, or is the PSR relying on calculations drawn directly from the third or fourth-hand accounts made to credit card representatives who passed it on to another agent for recording? The Court should have evidence to support such findings. Where are the witness statements detailing the loss? Paragraph 21 [of the PSR] states that Citibank has suffered a total loss of $100,978.18, but the Court has no proof of why it should use that amount. The PSR cannot contain

---

[2](...continued)
occurred or the actual loss was less than $500.00 per card, and "actual loss . . . for the other 56 access devices as their [actual] loss exceeded $500.00 [per card]." ROA, Vol. 3, PSR at 7.

unfounded, unproven numbers as the basis for the Court's decision.

Id. Lastly, Orr's counsel "object[ed] to the finding of the facts and legal interpretation of Paragraph 29 of the PSR," which imposed the two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A) because the offense involved ten or more victims. Id. In support of this objection, Orr's counsel stated:

> Application Note One of USSG 2B1.1 defines a victim as: (A) any person who sustained any part of the actual loss determined under (b)(1); or (B) any individual who sustained bodily injury as a result of the offense. We adopt the argument and authority asserted by counsel for Dixon in his objections to the conclusion regarding number of victims. There is no proof of actual loss to in excess of 10 victims.

Id.

The probation officer, in response to these objections, prepared an addendum to the PSR stating, in pertinent part:

> Defendant's Objection No. 1: The defendant objects to the factual basis for the findings of relevant conduct in this case.
>
> Probation Officer's Response to Defendant's Objection No. 1: Based on the conduct that occurred in Oklahoma and Texas, the facts show that this case involved a conspiracy to make counterfeit credit cards from data mined through the use of skimming devices. Orr has been identified by co-defendants of the conspiracy as an integral part of this conspiracy both in Oklahoma and in Texas. The counterfeited credit cards produced and used as a result of the conspiracy has resulted in significant loss to credit card companies. The Probation Officer maintains that Orr is accountable for all unauthorized access devices seized in this case to include the relevant conduct which occurred in Texas.
>
> Defendant's Objection No. 2: The defendant objects to receiving a two level enhancement for 10 or more victims.

7

> Probation Officer's Response to Defendant's Objection No. 2: As argued by counsel for the defendant, the individuals victimized in this case had their loss reimbursed by their credit card companies. In accordance with U.S.S.G. § 2B1.1, Application Note 1, a "victim" means any person who sustained any part of the actual loss determined under subsection (b)(1). Further, Application Note 3(A)(E)(k), discusses credits against loss, which considers the impact of the return of money to the victim. These victims are treated as having suffered a loss but then allow the defendant to take credit against the total loss for the value of the returned loss. The provision of credits against loss recognizes that there was in fact an initial loss, even though it was subsequently remedied by recovery. Therefore, the Probation Officer maintains that the five individuals whose credit card accounts were fraudulently charged suffered an initial loss and are victims in this case along with their five credit card companies, resulting in a total of ten victims required for the two level enhancement, pursuant to U.S.S.G. § 2B1.1(b)(2)(A).

Id., Addendum to PSR at 1-2.

The district court conducted a sentencing hearing on June 3, 2008. During the hearing, the government presented the testimony of a Secret Service agent who testified about Orr's involvement in a Dallas-based conspiracy to create and use counterfeit credit cards. At the conclusion of the agent's testimony, the district court found, "by a preponderance of the evidence," that "[t]he conduct in this case . . . involved a conspiracy to make counterfeit credit cards from data that was mined through the use of wedges or skimming devices," and that "[t]hese cards . . . were initially compromised and counterfeited in Texas." ROA, Vol. 2, Sentencing Transcript at 76. In turn, the district court found "by a preponderance of the evidence that the defendant [wa]s accountable for the losses associated with all the unauthorized access devices seized in Oklahoma and in Texas . . . ."

8

Id. at 79. With respect to Orr's objection to the fourteen-level enhancement for amount of loss, the district court overruled that objection, concluding, in summary fashion, that the amount of loss was "$472,032.18 after application of the guidelines." Id. The district court also overruled Orr's objection to the two-level enhancement for ten or more victims. In doing so, the district court found "by a preponderance of the evidence that the numerous individuals whose credit cards were fraudulently charged sustained an initial loss and [we]re properly counted, along with the credit card companies, as victims in this case" under "Section 2B1.1(b)(2)(A)." Id. at 80. Accordingly, the district court stated that "[t]he [PSR] w[ould] form the factual basis for the court's sentence," and it sentenced Orr to a term of imprisonment of seventy-seven months. Id.

## II

On appeal, Orr challenges the two sentencing enhancements that he objected to below. When a defendant disputes facts from a PSR purporting to support a sentencing enhancement, the district court's Rule 32(i)(3)(B) obligation is invoked. United States v. West, 550 F.3d 952, 976 (10th Cir. 2008). Federal Rule of Criminal Procedure 32(i)(3)(B) requires that the district court "must—for any disputed portion of the [PSR] or other controverted matter—rule on the dispute. . . ." In reviewing a district court's application of the Sentencing Guidelines, "we review factual findings for clear error and legal determinations de novo." United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006) (per

curiam). The government bears the burden of proving sentencing enhancements by a preponderance of the evidence. United States v. Conley, 131 F.3d 1387, 1389 (10th Cir. 1997).

*The § 2B1.1(b)(2) enhancement for ten or more victims*

Orr contends the district court erred in determining that the offense involved ten or more victims and in turn imposing a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A). Orr argues that, under § 2B1.1(b)(2)(A), "one can only be counted as a victim if that person or entity has suffered monetary harm," and "[i]n the present case, the persons whose credit cards were fraudulently used were not victims under this definition because . . . their losses were reimbursed by the credit card companies." Aplt. Br. at 11. Thus, Orr argues, "[t]his leaves only the five credit card companies referred to in the Addendum [to the PSR] as countable victims." Id.

Section 2B1.1(b)(2)(A) of the Sentencing Guidelines provides that in cases involving counterfeit instruments, such as the counterfeit credit cards manufactured and utilized by Orr in this case, a district court should increase the defendant's base offense level "by 2 levels" "[i]f the offense . . . involved 10 or more victims . . . ." U.S.S.G. § 2B1.1(b)(2)(A) (2007). Application Note 1 to § 2B1.1 defines the term "victim," in pertinent part, as "any person who sustained any part of the actual loss determined under subsection (b)(1)," and further defines the term "person" to "include[] individuals, corporations, companies,

10

associations, firms, partnerships, societies, and joint stock companies." Id., cmt. n.1. Application Note 3, which generally applies to the determination of loss under subsection (b)(1), defines the phrase "actual loss" to "mean[] the reasonably foreseeable pecuniary harm that resulted from the offense," and the phrase "pecuniary harm" to "mean[] harm that is monetary or that otherwise is readily measurable in money." Id., cmt. n.3.

Although the PSR alleged that seven of the twenty-six counterfeit access devices seized on August 24, 2007, had been fraudulently used, the government's evidence at trial provided details regarding only four of those devices (two account numbers issued by Citibank and two account numbers issued by American Express). Further, even with respect to those four access devices, the government's evidence did not indicate whether the legitimate account holders had been fully reimbursed by the issuing companies or had actually incurred part of the actual loss. At Orr's sentencing hearing, the government's sole witness testified about Orr's involvement in the Dallas-based conspiracy to create and use counterfeit access devices, but did not provide any details regarding specific losses actually incurred by legitimate account holders or their issuing banks. Given this dearth of evidence, the district court's determination that the offense involved ten or more victims must be deemed clearly erroneous.

The district court, in justifying its determination that ten or more victims were involved, concluded that "the guidelines recognize the existence of an initial

11

actual loss to the individual victim even when the loss is subsequently recovered." ROA, Vol. 2, Sentencing Transcript at 80. In support of this conclusion, the district court cited to Application Note 3(e)(i) to § 2B1.1[3], which it interpreted as "treat[ing] people who recover collateral, money, property, or services as victims . . . ." Id. According to the district court, this "recognize[d] the existence of an initial actual loss to the individual victim even when the loss is subsequently recovered." Id.

The district court's reliance on Application Note 3(e)(i), however, was misplaced. Application Note 3, by its own express terms, "applies to the determination of loss under subsection (b)(1)." As the Fifth Circuit recently recognized in United States v. Conner, 537 F.3d 480, 491 n.38 (5th Cir. 2008), the calculation of "loss" for purposes of § 2B1.1 is a "distinct concept" from the identification of "victims" for purposes of § 2B1.1, and "[w]e should not look to a separate provision of the Application Notes to create an ambiguity in the provisions relevant to defining 'victim,' when no ambiguity exists when looking at those provisions alone." Further, even assuming that Application Note 3 could be viewed as relevant to the identification of "victims," it does not support the district court's determination that there is a distinct concept of "initial loss" that

_____

[3] Application Note 3(e)(i), entitled "Credits Against Loss," provides, in pertinent part, that "[l]oss shall be reduced by . . . [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1, cmt. n.3(E)(i) (emphasis added).

12

can be taken into account in calculating the number of victims. To the contrary, §

2B1.1 and its Application Notes all focus on "actual loss," and if an individual

credit card account holder is fully and timely reimbursed by his or her credit card

company or issuing bank for any fraudulent charges made with the account (or is

not required to pay any such charges), then he or she has suffered no "actual

loss." See United States v. Kennedy, 554 F.3d 415, 419 (3d Cir. 2009) (holding

that individual account holders were not "victims" for purposes of § 2B1.1(b)(2)

because the government "failed to meet its burden to prove that the account

holders even knew that their funds had been stolen before they were completely

reimbursed"); United States v. Pham, 545 F.3d 712, 719 (9th Cir. 2008) (holding

that if individual "account holders victimized by Pham were fully reimbursed as

soon as they notified their banks of the fraudulent activity, then they cannot

reasonably be said to have suffered or 'sustained' the losses that were only

temporarily and fleetingly reflected in their accounts"); Conner, 537 F.3d at 489

(holding that individual credit account holders who were fully reimbursed for the

fraudulent charges made on their accounts "did not suffer any 'actual loss' and

therefore were not 'victims' under § 2B1.1(b)(2)"); United States v. Yagar, 404

F.3d 967, 971 (6th Cir. 2005) (holding that individual bank account holders who

were fully reimbursed by their banks for losses caused by defendant's fraudulent

conduct did not suffer an "actual loss" and thus were not "victims" for purposes

of § 2B1.1(b)(2)); but see United States v. Abiodun, 536 F.3d 162, 168-69 (2d

13

Cir. 2008) (holding "that individuals who are ultimately reimbursed by their banks or credit card companies can be considered 'victims' of a theft or fraud offense for purposes of U.S.S.G. § 2B1.1(b)(2) if–as a practical matter–they suffered (1) an adverse effect (2) as a result of the defendant's conduct that (3) can be measured in monetary terms")[4]; United States v. Lee, 427 F.3d 881, 895 (11th Cir. 2005) (suggesting that, "inherent in the credit against loss provision" of Application Note 3(E), "is an acknowledgment that there was in fact an initial loss, even though it was subsequently remedied by recovery of collateral or return of goods," and that a person who suffers an "initial loss" can be counted as a "victim" for purposes of § 2B1.1(b)(2))[5]. Finally, and perhaps most importantly as regards the case at hand, there was no evidence presented by the government at Orr's sentencing hearing to establish that ten or more specific individual account holders had sustained a loss. In light of that fact, Orr did not have the opportunity to raise what effect, if any, reimbursement to any individual account holders may have had. In other words, the government failed to carry its burden

---

[4] Abiodun does not support the district court's decision because the government presented no evidence that, as a result of Orr's conduct, any of the individual account holders suffered adverse effects that could be measured in monetary terms.

[5] The Fifth Circuit in Conner expressly rejected the Eleventh Circuit's analysis in Lee. 537 F.3d at 591 n.38. Further, the Eleventh Circuit in Lee ultimately offered an alternative ground for its decision, noting that the victims in its case "suffered considerably more than a small out-of-pocket loss and were not immediately reimbursed by any third party." 427 F.3d at 895.

14

of presenting sufficient evidence to support this enhancement.

In its appellate response brief, the government suggests that the district court's "reasoning is immaterial to the victim calculation in that the relevant conduct included fifteen financial institutions that suffered monetary loss." Aplee. Br. at 11. More specifically, the government argues that the "larger conspiracy" that Orr was found by the district court to have been involved in "impacted over 70 financial institutions with fifteen suffering monetary pecuniary loss." Id. at 19. Although the government effectively concedes that it failed to present any evidence regarding these institutions or their purported losses, it asserts that these "facts" were set forth in the PSR and not objected to by Orr. Id. at 19 n.13.

The government is clearly mistaken, however, in asserting that Orr failed to object to these allegations in the PSR. In the written objections filed by Orr's counsel to the PSR, Orr's counsel specifically and expressly called into question the PSR's allegations "that fifteen banks claimed losses of $154,962.53." ROA, Vol. 3, PSR, attached letter of Orr's counsel at 1. Indeed, Orr's counsel argued there was "no proof of these losses, how they were incurred, or how they are reasonably foreseeable to my client's decisions or actions," and he asserted that the district court "should have evidence to support such findings." Id. Relatedly, Orr's counsel expressly challenged the PSR's allegation that "Citibank ha[d] suffered a total loss of $100,978.18," noting that the district court "ha[d] no proof

15

of why it should use that amount." Id. Although the government was well aware of these objections, it made no attempt at the sentencing hearing to flesh out these factual allegations in the PSR as it was required to do. Conley, 131 F.3d at 1389.

For these reasons, we conclude that the two-level enhancement under § 2B1.1(b)(2) was erroneously applied, and that, as a result, Orr's case must be remanded for resentencing.

*The § 2B1.1(b)(1) enhancement for amount of loss greater than $400k*

Orr also contends that the district court erred in finding that the loss associated with the offense was more than $400,000, and in turn imposing a fourteen-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1). In support of this contention, Orr asserts that "[a]t the sentencing hearing the government presented evidence of an extended card fraud conspiracy based in Texas, but did not present evidence supporting the disputed loss amounts." Aplt. Br. at 14-15. "Thus," he argues, "the district court had no evidence to support the loss amount." Id. at 15.

The government concedes in its appellate brief that "no evidence was presented at the jury trial or the sentencing hearing as to how the specific actual loss amounts were calculated in the PSR and, therefore, the fourteen-level enhancement . . . was not properly imposed." Aplee. Br. at 11.

We agree with Orr and the government on this point. Although the PSR contained allegations that the Dallas-based conspiracy involved approximately

16

704 counterfeit access devices and approximately $472,032.18 in associated "losses," Orr objected to these allegations and the government failed to present any evidence to substantiate the allegations at the time of sentencing. Thus, the district court's "findings" regarding the amount of loss are insupportable.

Accordingly, we REMAND this matter to the district court for resentencing.