[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16955

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 2, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-00308-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONALD FLOYD BROWN,
a.k.a. Donald Brown,
ERIC THOMAS BROWN,
a.k.a. Charon Field,
a.k.a. Charon Fields,
a.k.a. Eric Brown,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Georgia

_____

(April 2, 2010)

Before MARCUS, FAY and ANDERSON, Circuit Judges.

PER CURIAM:

In this consolidated appeal, Defendants Brown and Fields mount several challenges to their convictions on charges relating to an attempted robbery of a credit union. We first relate the facts and procedural background, and then discuss the several challenges in turn.

## I. Factual and Procedural Background

Confidential informant Joseph Morris testified that Defendant Donald Brown approached him about robbing drug dealers and splitting the money. Morris stated that Brown said he wanted to do "an easy robbery," and indicated that the Georgetown Federal Credit Union would be "a sweet lick." Through his brother, an ATF informant, Morris contacted the FBI. After meeting with the FBI, Morris testified that he met with Brown two or three more times to discuss the robbery. Morris further testified that Brown wanted him to get a rental car, masks, and guns.

On September 23, 2007, a Sunday, Brown and Morris drove to Georgia Heritage Credit Union to check it out. They checked for the presence of security guards and what getaway route they could use. When Morris pulled his van in front of the credit union, Brown instructed him to move so the van would not be caught on surveillance tape. Morris testified that they spent about ten minutes sitting in the parking lot, discussing their plans. The next day, Morris picked up

2

Brown and Defendant Charon Fields[1] and they went again to the Georgia Heritage

Credit Union. Morris testified that Brown instructed him to get out of the car and

see if there were any security officers working at the bank; they also drove around

the apartment complexes that surround the bank to scope out a getaway route.

Morris testified that Brown mentioned robbing a specific drug house during the

meeting, and Morris's contact at the FBI confirmed that Morris told him Brown

mentioned that during the September 24th meeting. Before he met with the

Defendants on the 24th, Morris was equipped with a recording device by the FBI,

but the recording device failed to produce anything audible from that meeting.

On the evening of the 24th, Brown called Morris to come and pick him and

Fields up. Morris drove the Defendants to another house, and when the Defendants

came out of the house, Brown was holding a rifle and Fields was holding

something wrapped in a blanket that Morris thought was a shotgun. Afterwards,

Morris dropped both men off at Fields' house and called his FBI contact to relay

what had happened. Early the next morning, Brown called Morris and said that

"we've got to go and take care of some stuff;" Morris took this to mean that the

robbery was on for that day so he met with his FBI contact and received another

---

[1]     Defendant Charon Fields was indicted initially under the wrong name – Eric Brown.

3

recording device. They discussed what the plan would be if the robbery was to take place that day.

After leaving his meeting with his FBI handler, Morris picked up Brown and Fields in his van. The Defendants initially put the guns in the third row seat but then they moved them to the back, where Morris had other things that he planned to sell in a garage sale. On the recording one can hear Fields instructing "Put them all the way in the back." Defendants point out that the FBI did not take an inventory of the van's contents before the pickup. Further, they note that the agent watching the house did not see any guns being put in the van nor did he see Fields with a shotgun, as Morris had testified.

The FBI and other law enforcement agencies set up a road block off of Truman Parkway and planned to detain the van under the auspices of a traffic stop. However, as the would-be robbers were traveling, Brown instructed Morris not to pull onto Truman Parkway because he noticed police around. At that point Morris is heard on the recording stating that his child had a free account at another credit union and that they could go there. Morris states on the recording that he could check it out. Immediately afterwards the party stopped at an Advanced Auto Parts store, ostensibly to repair something on the van. Morris went to the restroom and called his FBI contact, telling him that the target of the robbery would now be the

4

Memorial Health Credit Union.

Five minutes later, the party got back in the van and proceeded towards Memorial Health Credit Union. The recording has a lot of inaudible portions to it, but except as noted below the conversation appears to be of a general nature and not about the impending robbery. However, it recorded Brown telling Morris "if it looks good, then it's on" and Fields' statements that they should just go in and come on out, and he intended to rob "the shit" out of that "motherfucker." Morris pulled the van in front of the Memorial Health Credit Union and, leaving the other two in the van, went inside to talk to a teller about his child's account. While Morris was out of the van, law enforcement officers arrested the Defendants. They found matching camouflage ski masks in both Defendants' pockets, and Fields had a pistol and shotgun shells; a shotgun shell also fell out of Fields' lap as he was removed from the van. In the back of the van the agents found two shotguns, one of which had been sawed down. No prints were found on either shotgun.

After he was given his Miranda warnings, Brown was interviewed by the police. He gave a fake name and birth date for himself as well as a fake name and address for Fields. He said that Morris was just giving them a ride across town and denied knowledge of the shotguns, the gun in Fields' waistband, or Fields' matching camouflage mask.

5

Several days after the arrest, police officers executed a search warrant on Fields' house. They found miscellaneous writing that referred to gangs and committing crimes with guns. They also seized Fields' computer and forensics performed on it revealed that on the morning of the arrest, someone had searched local credit unions' locations, hours, and personnel. The police found a box of shotgun shells that matched many of the shells found on Fields and in the van.

The Defendants were indicted for conspiracy, attempted bank robbery, and possession of an unregistered short-barreled shotgun. Brown was indicted for being a felon in possession of a firearm. Fields filed a motion to suppress, arguing that the search warrant and search were overbroad; the magistrate judge rejected his argument after a hearing. A jury found both Defendants guilty of all the charges against them and the court sentenced Brown to 150 months' imprisonment and Fields to 97 months' imprisonment.

## II. Discussion

A. Brown's argument that the first paragraph of 18 U.S.C. § 2113(a) requires actual force and violence or intimidation in an attempt to rob the credit union.

The first paragraph of § 2113(a) provides that

> Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; . . .

is guilty of the crime of bank robbery. 18 U.S.C. § 2113(a). Brown points to a Fifth Circuit case where, even in the context of an attempt charge, the court held that the government must show that the defendant used actual force and violence or intimidation to convict under that provision. See United States v. Bellew, 369 F.3d 450 (5th Cir. 2004). Because the Government here did neither, he argues, his conviction is invalid under that provision.

Brown did not raise this issue below. Therefore, we review this issue for plain error. Under plain error review, there must be (1) an error, (2) that is plain, (3) that affects the defendant's substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993)). "We have held that an error cannot meet the 'plain' requirement of the plain error rule unless it is 'clear under current law.'" United States v. Humphrey, 164 F.3d 585, 587 (11th Cir. 1999) (quoting United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993)). Where neither the Supreme Court nor this

Court has ever resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue. Id. at 588.

This is an issue of first impression in our circuit and the Supreme Court has not addressed it. Further, there is a circuit split on this issue. See United States v. Wesley, 417 F.3d 612, 618 (6th Cir. 2005) (recognizing creation of split by Bellew). Therefore, there is no plain error.

B.  Did the district court amend the indictment when it instructed the jury?

Brown argues that the district court's instructions to the jury amended the indictment, making the crime with which he was charged broader and thus violating his Fifth Amendment rights. The indictment charged Brown with knowingly and willfully attempting to take, by force and violence and by intimidation. However, Brown argues that the jury instructions failed to require the government to prove that the defendant used actual force and violence or intimidation. Instead, the court instructed that Brown could be found guilty if he intended to commit the crime and took steps towards doing it, without instructing that the Government had to show that Brown attempted to take money by force and violence or intimidation. Additionally, Brown asserts, the indictment's requirement that the Government show that Brown used force, violence and

8

intimidation was omitted from the instructions which required only force or violence or intimidation.

Brown's first argument is merely the same as his argument that the statute requires a showing of actual violence or intimidation. Like that argument, Brown did not raise it below. And like that argument, because that is not the law in this circuit, there is no plain error.

Turning to Brown's second claim, there is no error because "the law is well-established that where an indictment charges in the conjunctive several means of the violating a statute, a conviction may be obtained on proof of only one of the means, and accordingly the jury instruction may properly be framed in the disjunctive." United States v. Simpson, 228 F.3d 1294 (11th Cir. 2000).

C.  Did the Government fail to allege all of the essential elements in Count II?

Brown argues his conviction cannot stand because the Government did not allege that he took money from a person or in the presence of a person, as required by § 2113(a). Because Brown never objected to the indictment below, he is required to show that the indictment is "so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted."

9

United States v. Hooshmand, 931 F.2d 725, 734-35 (11th Cir. 1991) (internal quotations omitted). Indeed, "practical, rather than technical, considerations govern the validity of an indictment. Minor deficiencies that do not prejudice the defendant will not prompt this court to reverse a conviction." United States v. Chilcote, 724 F.2d 1498, 1505 (11th Cir 1984). "Moreover, when the indictment specifically refers to the statute on which the charge was based, the statutory language may be used to determine whether the defendant received adequate notice." Id. Here, the indictment referred to the statute; therefore, Brown cannot show that it is defective and we reject his argument.

D. Was there sufficient evidence to convict the Defendants of attempted bank robbery?

1. Brown

Brown argues that the evidence was insufficient to convict him of bank robbery because Morris was not a credible witness and there was no evidence that the credit union was the Defendants' target. Brown points to Morris's inability to produce audible tape recordings and Morris's admission that he was a felon seeking money for cooperating as an informant. Brown also points out that Morris initially reported that Brown wanted to rob a drug house but that the FBI was not

10

interested because it was not within their jurisdiction. He argues that although Fields' computer revealed that searches about credit unions had been performed the day of the arrest, there was no evidence that he was involved in those searches. Further, the audio tapes, he asserts, do not support the conviction because although there was some talk that suggested guns were loaded in the van, there was no discussion about where to park a getaway car, who would drive it, or whether other participants had been recruited. He asserts that once he saw the police, Morris could not continue that way and because Morris wanted to get paid, he came up with the idea of checking out an account for his child at the other credit union. Brown points out that he was in the backseat of the van, seatbelted, when arrested. The guns were not out, his mask was in his pocket and neither he nor Fields was making any preparations to run into the credit union. Therefore, he argues, the evidence falls short of the substantial evidence required to sustain the guilty verdict.

In order to convict a defendant of the crime of attempt, the government must prove "(1) the defendant was acting with the kind of culpability otherwise required for the commission of the crime for which he is charged with attempting, and (2) the defendant was engaged in conduct that constitutes a substantial step toward the commission of the crime." United States v. Root, 296 F.3d 1222, 1227-28 (11th

11

Cir. 2002) (quotation marks omitted). In order to show a substantial step was taken, "'the defendant's objective acts, without reliance on the accompanying mens rea, must mark the defendant's conduct as criminal.'" Id. at 1228 (quoting United States v. Carothers, 121 F.3d 659, 662 (11th Cir. 1997)).

Unless testimony is incredible as a matter of law, we must accept that determination. United States v. Hewitt, 663 F.2d 1381, 1386 (11th Cir. 1981). As that court stated, "judgment of acquittal . . is not required because the government's case includes testimony by "an array of scoundrels, liars and brigands." Id. at 1385.

Here, the evidence was sufficient to sustain the convictions. Morris's testimony, corroborated by the physical evidence and the post-arrest interview with Brown, provided a sufficient basis for the verdict. The jury clearly credited Morris's testimony and that testimony was buttressed by evidence of Brown loading of guns into the van, Brown's request to Morris to drive to Memorial Health Credit Union, the mask found on Brown, and Brown's post-arrest denials that were strikingly similar to denials he gave when last arrested in a robbery.

Morris testified, with some corroboration and in great detail, clearly establishing that the Defendants intended to rob the initial targeted credit union. Then when Brown saw police, Morris testified that the Defendants agreed to abort

their effort to rob that one, and instead agreed to rob the Memorial Health Credit Union. Morris's testimony in this regard was corroborated by the recorded discussion before stopping at the auto parts store about checking out the Memorial Health Credit Union, by Morris's report to his FBI handler when they stopped at the auto parts store, and by the recording on the way from the auto parts store to the new target. With respect to the latter, Brown is heard saying "if it looks good, then it's on;" Fields is heard saying he intended to "rob the shit" out of it. Also, contrary to Brown's argument, there is evidence of conduct constituting a substantial step toward completion of the crime. The Defendants drove to the Memorial Health Credit Union fully armed with ski masks in their pockets, parked the vehicle and waited in it while Morris entered the credit union to check it out.

2. Fields

Fields argues that the Government failed to show that he took a substantial step toward committing the robbery. He argues that Morris was the one who chose the destination, the one who drove, and the one who got out of the van once they got to their destination. Fields also points to Morris's testimony that he went into the bank to "get away" from the Defendants.

The Government responds with two unpublished cases in which the facts

13

were fairly similar to this one and we held the evidence sufficient to convict. In one case, the defendant was stopped with all of the paraphernalia needed to rob a bank. In the other, the defendant armed himself and drove to the warehouse where the robbery was to take place. In this case, Fields searched the internet for information about local credit unions, armed himself, had a mask, and had himself driven to the credit union. As indicated above, there was sufficient evidence of a substantial step.[2]

E. Did the Government prove that Brown knew that the shotgun was sawed off?

Brown argues that there was insufficient evidence to convict him of violating 26 U.S.C. § 5861(d) because there was no evidence he knew that the shotgun had been sawed off or that he possessed it. Although the standard for constructive possession is whether the defendant had the "intent and power to exercise dominion and control over" the firearm, mere presence near the firearm is not enough. United States v. Hernandez, 433 F.3d 1328, 1333 (11th Cir. 2005).

Brown cites an unpublished opinion to support his argument that he did not

---

[2] Fields also challenges the sufficiency of the evidence because much of it was from Morris, whom he claims was impeached. However, the jury clearly believed him and, as discussed above, we will not upend that determination without good cause.

14

possess the shotgun. In that case, the defendant was a passenger in a car on its way to rob a drug-dealer. During the ride, a co-conspirator showed the defendant the gun that the defendant would be using during the robbery. This court reversed the felon in possession conviction because although there was evidence that the defendant knew that the gun was in the car and he had the intent to exercise dominion over it later, there was no evidence that the defendant ever had the *power* to exercise dominion or control over the weapon prior to his arrest. The court noted that the defendant was not the leader.

Brown's unpublished case is distinguishable. The gun there was being held by a co-conspirator; here, the gun was in the back of the van and Brown helped put it in there. Therefore, he had the power to possess the gun. Moreover, the jury in this case could reasonably conclude that Brown was the leader of the venture.

Testimony at the trial established that the shotgun was wrapped in a blanket; therefore, it is certainly conceivable that Brown did not know what it looked like. However, the jury could have reasonably believed that because the Defendants retrieved the guns from the house together, and loaded them into the van, Brown had the opportunity to see the shotgun. Although the guns were wrapped when the CI saw the two defendants bring the guns out of the house, they may not have been wrapped before bringing them out. There is an even stronger inference that Brown

15

saw the shotgun on the morning of the attempt: when the CI picked up both Defendants, who were in Fields' house together, the CI saw Fields loading one of the guns. A reasonable jury could infer that both guns were loaded that morning, that Brown was present when the guns were loaded, and that Brown would have seen that the gun was short.

F. Did the district court err when it failed to apply the three point reduction for attempt or conspiracy?

Brown argues that he should have received the three-level reduction under U.S.S.G. § 2X1.1(b)(1) and (2) because he was not about to complete all of the necessary acts for robbery before being arrested. Brown asserts that as in this Court's precedent, he had not and did not believe that he had taken "crucial steps" to commit the robbery because he would have chosen a less conspicuous vehicle, established a get-away route, obtained another escape vehicle, and recruited another conspirator to drive the get-away vehicle before actualizing the conspiracy.

This Court reviews "the district court's factual findings for clear error" and its interpretation and application of the Sentencing Guidelines de novo. United States v. Miles, 290 F.3d 1341, 1346 (11th Cir. 2002). Contrary to the Government's contention, this Court should in this instance review de novo, and

16

not for clear error, because Brown challenges the district court's application of

U.S.S.G. § 2X1.1(b) and not the court's factual findings.

Section 2X1.1(b) of the Guidelines provides a three-level reduction in the base offense level for attempt, conspiracy, and solicitation unless certain circumstances have occurred. For attempt and conspiracy, the reduction does not apply if "the defendant [or a co-conspirator] completed all the acts the defendant believed necessary for successful completion of the substantive offense or . . . was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control." U.S.S.G. § 2X1.1(b)(1). Section 2X1.1(b)(1) addresses attempts, and § 2X1.1(b)(2) addresses conspiracies in the same language (as indicated by the brackets inserted in the foregoing quote). Furthermore, the background section of § 2X1.1 explains that:

> In most prosecutions for conspiracies or attempts, the substantive offense was substantially completed or was interrupted or prevented on the verge of completion by the intercession of law enforcement authorities or the victim. In such cases, no reduction of the offense is warranted. Sometimes, however, the arrest occurs well before the defendant or any co-conspirator has completed the acts necessary for the substantive offense. Under such circumstances, [the reduction is appropriate].

U.S.S.G. § 2X1.1, comment. (background). In this case, because Brown did not complete the substantive offense, the second part of § 2X1.1(b)(1) – the part

17

quoted above – is relevant to the analysis.

In United States v. Khawaja, this Court addressed the application of § 2X1.1(b)(2) and held that where the conspirators "had not taken crucial steps" to commit the substantive offense and did not believe that they had completed all the acts necessary on their part nor were they about to compete them, the reduction under § 2X1.1(b)(2) should apply. 118 F.3d 1454, 1458 (11th Cir. 1997). The Court in Khawaja noted that although the defendants intended to launder a total of $2 million, they were only liable for $570,566, the actual amount laundered at the time of arrest, because the government could not demonstrate that they had taken crucial steps in arranging for specific transactions for the remaining funds to occur in the future, such as preparing falsified documentation, securing cashier's checks, or arranging meetings for the exchange. Id.

On the other hand, in United States v. Lee, this Court held that the three-level reduction under § 2X1.1(b)(2) was inapplicable because the defendants had completed all the steps that they believed were necessary for the offense and were only prevented from doing so by the potential victims' refusal to honor fraudulent checks. 427 F.3d 881, 894 (11th Cir. 2005). Specifically, the Court in Lee held that the record demonstrated that the defendants had "completed all the acts necessary to commit mail fraud," such as writing checks drawn from closed bank

18

accounts and providing misleading information to potential victims to ensure that the bad checks would be honored.  Id.

This case is more analogous to Lee than Khawaja because Brown had completed all the crucial steps and was about to commit the underlying offense of robbery but for intervention by the police.  Specifically, Brown arrived at the targeted credit union with two accomplices, two loaded shotguns in the back of the van, and a ski mask in his pocket.  Unlike the previous reconnaissance trips, Brown brought firearms this time.  Brown also stated on the way to the credit union that "if it looks good, then it's on."  Moreover, internet search history on the computer belonging to Fields, a co-conspirator who was arrested in the same van as Brown, showed that someone had researched details of and directions to credit unions the day of the attempted robbery.  Lastly, consistent with the background commentary of § 2X1.1(b), this case falls under the majority of "prosecutions for conspiracies or attempts," where the three-level reduction is inapplicable because the substantive offense was prevented "on the verge of completion" by law enforcement, instead of the minority category where the "arrest occurs well before" any defendant has completed the acts necessary for the substantive offense.  § 2X1.1, comment. (background).  Therefore, the district court did not err in choosing not to apply the three-level reduction under § 2X1.1(b)(1) or (2).

19

Brown's argument that the "crucial steps" of robbing a credit union required him to drive a "less conspicuous vehicle," establish a "get-away route," and obtain another "escape vehicle" and also its driver, is without merit. Brown's argument adds an artificial requirement to § 2X1.1(b)(1) and (2) by forcing the government to prove the completion of crucial steps to a perfectly executed plan, rather than completion of only the crucial steps, as delineated in Khawaja. The record shows that Brown could have robbed the credit union without the preparations listed above because while such preparations potentially could have improved his chances of success, they were not vital to the completion of the conspiracy.

Furthermore, contrary to Brown's contention, Khawaja is distinguishable from this case. This Court in Khawaja held that the three-level reduction was applicable because even though the defendants intended to launder $2 million, they had not "arranged for specific transactions to occur in the future" to facilitate the laundering of the full amount. Khawaja, 118 F.3d at 1458. In this case, unlike the defendants in Khawaja whose future acts of laundering were distant and speculative at best, Brown and his co-conspirators were arrested outside of the credit union with loaded shotguns. Therefore, we conclude that the district court did not err when it declined to award the three-level reduction to Brown.

G. Did the district court err when it denied Fields' motion to suppress?

Fields argues that the district court erred when it did not suppress the evidence found during the search of his residence pursuant to an overbroad search and warrant. He asserts that the language of the warrant, permitting the officers to search for "any fruits of the crime of armed robbery and any writings and/or pictures that depict the offenses as described above, or any other criminal offense," was unconstitutionally broad. Because he never accomplished the crime of armed robbery, there could be no fruits of it. Next, he points to the items seized by the police and argues that they demonstrate that the search was too broadly defined.

Warrants are constitutionally required to specify what is to be searched, and the things to be seized, but "'elaborate specificity in a warrant is unnecessary.'" United States v. Peagler, 847 F.2d 756, 757 (11th Cir. 1988)). Here, the warrant read

> ANY AND ALL EVIDENCE RELATED TO THE CRIME OF
> ARMED ROBBERY; ANY FIREARMS, FIREARM
> AMMUNITION, FIREARM PARTS, FIREARM
> PARAPHERNALIA; ANY ARTICLES AND/OR PICTURES
> DEPICTING OR SHOWING FIREARMS; ANY CLOTHING
> OR ARTICLES USE [sic] TO CONCEAL ONE'S IDENTITY;
> ANY PICTURES AND OR WRITINGS DEPICTING
> FIANCIAL [sic] INSTITUTIONS, OR OTHER COMMON
> TARGETS OF THE CRIME OF ROBBERY; ANY FRUITS OF
> THE CRIME OF ARMED ROBBERY ANY WRITINGS
> AND/OR PICTUES [sic] THAT DEPICT THE OFFENSES AS

21

DESCRIBED ABOVE, OR ANY OTHER CRIMINAL
OFFENSE.

The magistrate judge noted that while the language at the end of the warrant was "undoubtably unfortunately phrased," it did not provide unfettered discretion to the officers for several reasons. First, the magistrate judge observed that the offending clause – "any other criminal offense" – modified the last phrase of the items to be seized clause, which permitted the search and seizure of writings and pictures. This, the court found, was fairly narrow. Second, none of the items seized were taken because of the offending language. Third, the "good faith" exception would apply because the detective executing the search acted in reliance upon its validity.

We agree with the magistrate judge that the language of the warrant, while not a paragon of well-tailored language, was sufficiently narrow in scope. The vast majority of the language is narrowly tailored to armed robbery. And, although writings fell under the broadly worded portion of the warrant, the seized writing pertained to guns, which relates them to armed robbery. The remedy for overbreath in a warrant is severance but because none of the things seized were a result of that language, severance is not warranted. The pill bottles were apparently seized because they were in plain view and the other items seized appear to be within the narrower portions of the warrant.

The magistrate judge also correctly rejected Fields' argument that the computer was improperly searched. The Supreme Court has stated that "a warrant that authorizes an officer to search a home for illegal weapons also provides the authority to open closets, chests, drawers, and containers in which the weapon may be found." United States v. Ross, 456 U.S. 798, 821, 102 S.Ct. 2157, 2171 (1982). Here, all that the detective did was see the computer, which was on, and look at the search history for Google, the site to which it was opened. This was not invasive or beyond the scope of the search. Therefore we reject Fields' challenge to the warrant.

H. Should the district court have suppressed Fields' writings because their admission violated his First Amendment rights and Fed.R.Evid. 404(b)?

Fields argues that the admission of his writings, which referenced gangs, violated his First Amendment rights because they merely showed his abstract beliefs and were not related to this case. Similarly, he asserts that the admission violated Rule 404(b) because it put his character on trial.

The case upon which Fields relies for his First Amendment argument is Dawson v. Delaware, 503 U.S. 159, 112 S.Ct. 1093 (1992), where the defendant's membership in a racist group was introduced at trial, despite the fact that the victim

23

was of the same race. The Court held this prejudicial because there was no relationship between crime for which he was being tried and mere membership in the group. As the Court noted, the government had but did not put on evidence about the violent and murderous nature of the group to which the defendant in Dawson belonged; had the government introduced that evidence, they would have had "a much different case" before them. Id. at 165, 112 S. Ct. at 1097.

Here, the writings were introduced because they contained references to shotguns, which rebutted Fields' defense that the weapons were Morris's. The Government points out that it did not seek to introduce all of the gang-related writing but only those that mentioned firearms and specifically the type of shotgun found in the van. Because the writings were introduced to show knowledge of the firearms, their introduction did not violate either the First Amendment or Rule 404(b); the evidence was not introduced to impugn Fields but rather to show his knowledge. Therefore, this case is more like the "different case" that the Supreme Court acknowledged could exist and approved.

For the reasons stated above, the convictions and sentences of the Defendants are

**AFFIRMED.**